John C. Sullivan*
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Allison R. Lucas
   MI State Bar No. P73331
Aaron Siri*
Elizabeth A. Brehm*
Walker Moller*
SIRI | GLIMSTAD
220 West Congress Street, 2nd Floor
Detroit, MI  48226
Telephone: (313) 251-9161
Facsimile: (646) 417-5967
alucas@sirillp.com
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Counsel for Plaintiffs
* Motions for admission forthcoming

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

|  |  |
|---|---|
| ROBERT W. ODELL, JR.; GREGORY MICHAEL PINGOT; KATIE ANN KOTULA; CONNIE JOYCE JONES; PATRICIA LYNN VERLANDER; KEVIN WEBBER; AUSTIN ROBERT ISAAC HUDNUTT; CHRISTIAN TOUGAS; CHARLES CHRISTIAN GALTON; TRAVIS WAYNE ROBERTSON; and KEVIN MCALLISTER, on their own behalf and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> KALITTA AIR, LLC, and CONRAD ("CONNIE") KALITTA, <br><br> *Defendants*. | Civil Action No.: _____ <br><br> Jury Trial Demanded |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Robert Odell, Jr.; Gregory Pingot; Katie Kotula; Connie Jones; Patricia Verlander; Kevin Webber; Austin Hudnutt; Christian Tougas; Charles Galton; Travis Robertson; and Kevin McAllister (collectively, "**Plaintiffs**"), on behalf of themselves and all others similarly situated, complain as follows against Defendants Kalitta Air, LLC ("**Kalitta**") and its sole owner, Conrad "Connie" Kalitta.

2.      This is a class action brought to remedy Kalitta's pattern of discrimination against employees entitled to religious and/or medical accommodations from Kalitta's mandate that its employees receive the COVID-19 vaccine, as well as Kalitta's retaliation against those who made requests for accommodations.

3.      Rather than complying with its obligations under Title VII of the Civil Rights Act of 1964 ("**Title VII**") and the Americans with Disabilities Act ("**ADA**"), Kalitta responded by issuing generic denials for all accommodation requests. While the company technically "approved" the requests, Kalitta's so-called accommodation was to put anyone who was not fully vaccinated on unpaid leave pending termination: termination after three months if the employee requested a religious accommodation and termination after one year if the employee requested

2

a medical accommodation.  Per U.S. Equal Employment Opportunity Commission ("**EEOC**") Guidance, because a variety of other accommodation options were available that would not have caused an undue hardship, Kalitta's decision to place exempted employees on unpaid leave was not a reasonable accommodation, and provides strong evidence of the company's discriminatory intent.  "What You Should Know About COVID-19 and . . . Other EEO Laws," *available at* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L.

4.    Kalitta would brook no exceptions to its mandate and would consider no individual circumstances.  Indeed, the company told its employees that the "accommodation" for exempt employees would be unpaid leave followed by termination *before even a single request could be made*.  Even employees who worked entirely remotely were told they could not be accommodated and must take the vaccine or be terminated.

5.    Kalitta offered a series of justifications for its no-accommodation dictate, but those were continually rebutted by the facts.  What is left now is a series of post hoc rationalizations for an ill-conceived policy that violates Title VII and the ADA by allowing no accommodations.

3

6.     Initially, Kalitta blamed the federal government for its no-accommodation regime.   At the time the company announced its COVID-19 vaccination mandate, Executive Order 14042 ("**EO 14042**" or "**EO**") proposed a requirement that government contractors adopt and enforce a vaccine mandate or else lose government contracts.

7.     Kalitta supposedly interpreted the federal vaccine mandate as requiring a no-accommodation rule.  This unlawful interpretation was underscored by the fact that Kalitta deliberately rejected the recommendation of UNUM, an insurance company to which Kalitta outsourced medical exemption applications.  UNUM told Kalitta that medically exempt employees could be accommodated by wearing a mask.  Kalitta ignored this recommendation, purportedly due to a belief that EO 14042 preempted Congressionally enacted accommodation requirements.

8.     The truth is that Kalitta did not want unvaccinated employees, no matter their religious or medical reason for being unable to receive the shot.  As confirmed by a former Assistant Chief Pilot at Kalitta, the reliance on EO 14042 was pretext.  Further proof of this was seen on October 19, 2021, when the Vice President of Human Resources at Kalitta—Laurie Stockton—was asked in a conference call about exempt employees being allowed to work if the federal mandate were not in place.  She told those on the call—including Plaintiff Christian Tougas—that "even

4

if [employees entitled to an accommodation] could come back, *we don't want them back*."

9.     That animus toward exempt unvaccinated employees was already apparent from the company's skewed interpretation of EO 14042.  Even the Task Force guidance implementing the Executive Order explained, consistent with Title VII and the ADA, that individuals *could obtain an accommodation* if they are "not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." Congressional Research Service, *Executive Order 14042 Requirements for COVID-19 Vaccination of Federal Contractors* (updated December 13, 2021) (https://crsreports.congress.gov/product/pdf/IN/IN11803).  Kalitta willfully chose to ignore this guidance based on its own animist towards employees who could not be vaccinated for religious or medical reasons.

10.     If EO 14042 actually stated what Kalitta claimed, the EO would also have violated Title VII and the ADA, just like Kalitta has done.  But it is untenable that Kalitta could have reasonably believed that no accommodations were possible under EO 14042—the company's statements to employees stating as much were merely pretext for forcing out religious and disabled employees unable to receive a vaccination.

11.    While EO 14042 contained provisions for religious and medical exemptions—just like each of the federal mandates—Kalitta announced a no-accommodation policy in October of 2021 that would take effect on December 8, 2021 when the EO was set to begin.  The company attempted to cover up its blatant disregard of federal accommodation law by implementing a fake "accommodation" for exempt employees.  That so-called accommodation—unpaid leave followed by formal termination if the exempt employee did not acquiesce to Kalitta's demands concerning vaccination—was nothing more than a ruse intended to distract from its illegal conduct.  And the company claimed for two months that it was only happening "because of Biden."  Kalitta's sole owner, Conrad Kalitta, repeatedly informed employees that *he* had made the difficult decision because the government contracts at issue forced his hand and that those contracts did not allow exceptions: a false statement made to coerce compliance, an inauthentic justification to purge disfavored religious and disabled employees.

12.    After EO 14042 was stayed in early December 2021, the no-accommodation mandate could no longer be blamed on the President.  But already committed to its discriminatory process—including having already forced hundreds of employees to unwillingly take the vaccine—Kalitta pressed forward on its own, fulfilling Ms. Stockton's threat not to allow exempt employees at work.

13.    And so the company kept its policy and just shifted to arguing that the no-accommodation rule was necessary because of a "safety" rationale.  As Kalitta has now told the EEOC, accommodations were impossible because of the supposed—but never demonstrated—hardship unvaccinated employees *might* cause.  This pretextual and hypothetical justification is easily refuted.

14.    Even setting aside the fact that Kalitta only turned to its pretextual safety rationale long after the company had already implemented unpaid leave as its "reasonable accommodation," the safety rationale is falsified by the company's own actions.  Unwilling to upset other airlines and unions, Kalitta voluntarily allows "jumpseaters" who are unvaccinated onboard its aircraft, flying alongside Kalitta employees in close quarters.  Kalitta also has allowed, and continues to allow, unvaccinated workers from its sister companies and contractors to work in the Kalitta aircraft repair facilities at Oscoda, Michigan.  Thus, it appears that so long as Kalitta is not directly paying the unvaccinated person, that person is not a safety threat to Kalitta employees—but somehow the moment Kalitta directly hires the person they become an unacceptable safety risk.

15.    Sadly, even though Kalitta could accommodate all its exempt employees without any hardship whatsoever, the company refused to allow any unvaccinated employee to continue working and would not even consider individual

situations or possible accommodations, even in the face of overwhelming evidence mounting against mandates generally.  Even employees working *entirely remote* were subjected to Kalitta's no-accommodation policy.  Forcing vaccination on someone who works alone at home obviously cannot be justified under a banner of safety, and only underscored the company's already demonstrated commitment to purge religious and disabled employees.

16.     After the pandemic subsided due to the Omicron variant—a variant that infected and kept a substantial portion of Kalitta's 100% vaccinated workforce out during the month after Kalitta sent its exempt employees home—the company still refused to bring "accommodated" employees back to work.  It was apparent by then that vaccine efficacy significantly wanes over time and it was known that the odds of an infection for individuals only vaccinated with a primary series was 13 times greater than for individuals with natural immunity.  Sivan Gazit, *et al.*, *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV [preprint] (Aug. 25, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.     Thus, those vaccinated prior to Kalitta's mandate—who were not made to get booster shots— may have been *more* likely than unvaccinated individuals to contract and transmit COVID-19.  The pretext of Kalitta's safety rationale has only been underscored as

time has gone by, yet the company has inexplicably maintained it discriminatory, anti-science policies.

17.    Even when it was clear that the science could not support Kalitta's mandate—as many companies and even the World Health Organization admitted— the company concluded that it was not fair to bring back exempt employees because many who would rather have not taken the vaccine had already done so in order to keep their jobs.  In other words, Kalitta deemed it proper *not* to accommodate disabled and religious employees because the company had already coerced so many others with its draconian mandate.  Federal law prohibits such penalization of employees needing an accommodation from an employer's job requirement.

18.    Moreover, assuming that Kalitta's safety argument is not pretextual, even legitimate safety concerns cannot relieve Kalitta of its duties under Title VII and the ADA: accommodation is not optional for an employer when the costs of accommodating employees safely is nothing more than a *de minimus* burden, at most.  Importantly, this burden must be *demonstrated* by the employer.  As seen with countless companies across the Nation, including every major airline, reasonable (free) accommodations were readily available and could have been implemented at the time Kalitta forced employees out of work.

19.     Regular testing was an obvious choice for an accommodation, and one that Plaintiffs would have funded themselves in order to save their jobs.  Setting aside the fact that forced vaccines do not prevent employees from contracting and spreading COVID-19, *unvaccinated employees who do not have the virus certainly cannot spread it*.  Testing is thus the safest option for everyone, but one the company would not consider.  Additionally, there are many costless ways that Kalitta could have implemented that accommodation (such as making employees responsible for obtaining and showing negative test results).

20.     Alternatively, or in addition to testing, Kalitta could have recognized natural immunity as satisfying its inoculation requirement.  Notably, Kalitta has to date altogether avoided any discussion of natural immunity, likely because there is no good answer for why the company refused to consider it as satisfying its compulsory immunization policy.  Providing accommodations based on previous infections would have been in line with the CDC's recognition that a prior COVID-19 infection provides protection superior to a vaccine alone.  CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021* ("**CDC Report**"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who

were vaccinated alone").  That means unvaccinated individuals with a previous COVID-19 infection unquestionably have a greater immunity to the virus than those previously vaccinated but who have not gotten booster shots.  Natural immunity has been observed through hundreds of years of scientific research and has been universally accepted as at least equivalent to immunity derived from vaccination. This should be unsurprising given that vaccine-based immunization is but an artificial attempt to emulate the mechanisms of natural immunity.  Further, Kalitta does not even claim vaccine-induced immunity is superior to natural immunity. Plaintiffs have each contracted and recovered from COVID-19, but this immunity was ignored.  The company's insistence on requiring an immunization method that would realistically endanger its employees' health or cause them to violate their beliefs—when a no-cost and very effective alternative was available—gives rise to a strong inference of discriminatory intent.

21.    Alternatively, or in addition to testing and recognition of natural immunity, Kalitta could have asked unvaccinated employees to wear masks.  This measure had already been implemented by Kalitta as employees had previously been required to wear masks at times during the pandemic before vaccines became available, and were told by Kalitta that they were working "safely" by doing so. Moreover, this was the exact accommodation proposed by the third party Kalitta

hired to evaluate the medical exemption requests received by Kalitta. Such an accommodation would be especially sensible for flight crews since it is already virtually impossible to catch COVID-19 on an airplane because of the air filtration systems. Tellingly, Kalitta gives this option to unvaccinated employees from other airlines that Kalitta voluntarily allows to ride its aircraft. If Kalitta can make an accommodation for jumpseaters, Kalitta must make an accommodation for employees exempt under Title VII and the ADA, and easily could have without undue hardship.

22.     As the evidence demonstrates, Kalitta could have accommodated exempt employees and its justifications for not doing so were both pretextual and unsupported by fact.

23.     Rather than follow the law, Kalitta imposed onto Plaintiffs the choice of either taking the COVID-19 vaccine—at the expense of their religious beliefs and/or their health—or losing their livelihoods. Such a decision is one that anti-discrimination law was written to avoid as it has haunted not just Plaintiffs, but others similarly situated who were forced to weigh their medical and religious rights against the ability to provide for their families.

24.     Underscoring the discrimination taking place, Kalitta arbitrarily decreed that it would terminate everyone who sought a religious request for an

exemption after only three months of unpaid leave while letting those with a medical exemption remain technically "employed" for twelve months.  In other words, the company left itself more time to reinstate employees on medical exemptions because it evidently valued those employees more than those who sought accommodations on religious grounds or perhaps thought medical requests to be more legitimate in some sense.  While Kalitta is also committed to disability-based discrimination, the company apparently harbors a particularly intense animus towards religious employees.

25.     Then, adding injury to injury, Kalitta began retaliating against employees who sought a reasonable accommodation from the company's draconian mandate.

26.     Along with treating its exempt employees with disdain—walking them off the property as if they had done something wrong—Kalitta threatened fines against anyone not immediately returning company equipment such as iPads and iPhones.  This action never takes place when an employee is on any type of normal leave and was a direct punishment, especially for pilots who are supposed to stay current on training and procedures from both the company and the Federal Aviation Administration ("**FAA**") via their company equipment, even when on leave.

27.    But Kalitta was far from done.  The company began contesting the unemployment payments of every person forced out if the person had requested a religious accommodation or filed an EEOC charge against the company.  It is revealing that the terminated Kalitta employees who did *not* submit accommodation requests did not have their unemployment claims contested.  The same is true of those Kalitta put on medical leave who sought unemployment benefits.  Only those who sought to enforce their religious rights under federal employment law were targeted for this extra measure of punishment by the company.  (Later, however, Kalitta also attempted to contest the unemployment benefits of those on the medical leave once the company learned those employees had submitted EEOC charges against the company for failing to accommodate their disabilities).  In Kalitta's eyes, engaging in protected activity (seeking accommodation) was not only intolerable, it had to be punished.

28.    And finally, as further proof of the company's retaliation toward those who could not take the vaccine, Kalitta refused to bring employees back—even after it became apparent that: (i) the vaccines were not preventing COVID-19 breakouts in the company; or (ii) the pandemic was meaningfully over; or (iii) the CDC's "COVID-19 prevention recommendations no longer differentiate[d] based on a person's vaccination status."  CDC, *Summary of Guidance for Minimizing the*

14

*Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems – United States, August 2022*, https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm?s_cid=mm7133e1_w.   Kalitta's rationale: it would not be fair to bring back accommodated employees when others who did not want to take the vaccine acquiesced to the company's coercion.   But under federal law, accommodated employees are always treated differently for one reason or another; that is why it is called an accommodation.   Kalitta, however, persisted in its retaliation against the accommodated employees and does so to this day.

29.    These actions are all in addition to the direct retaliation experienced by Plaintiff Katie Ann Kotula who was fired immediately for expressing her desire for an accommodation as soon as Kalitta management determined it would not be able to coerce her out of exercising her rights.   Management believed that she was rallying others against the new policy and feared that others in the company would be inspired by someone willing to stand up for their beliefs in the face of a draconian (and unlawful) policy.   And as in everything the company does, Kalitta not only demands complete subservience, it also works to stamp out dissenting voices—in this case, the voices of employees attempting to exercise their rights under Title VII and the ADA.

30.    The threat of retaliation, along with Kalitta's promised fake "accommodation," also dissuaded many from even engaging in Kalitta's sham process.  If the only thing gained from applying for an exemption was worse treatment by the company (followed by termination), one was better off not even attempting to seek the false accommodation because doing so would just draw the ire of Kalitta management.  Federal employment law prohibits such discriminatory treatment.

31.    Kalitta has also continued its discrimination against the unvaccinated employees entitled to an exemption by claiming that it was "too late" for those who found out after Kalitta's own internal deadline for applying for an accommodation to do so.  For instance, Plaintiff Charles Christian Galton was already on medical leave when Kalitta's mandate was issued and did not find out about the new policy until January of 2022.  He was informed that any application for an accommodation would be untimely and he would merely be fired upon his return if he attempted to engage in that process.

32.    Through its actions, Kalitta violated Title VII and the ADA by failing to engage in the interactive process whatsoever, failing to provide reasonable accommodations that would have caused no hardship whatsoever, and then by retaliating against employees who engaged in protected activity.

16

## PARTIES

### A.    Plaintiffs

33.    Plaintiff Robert W. Odell, Jr. was a Flight Maintenance Engineer with Kalitta and lives in Mikado, Michigan.  Mr. Odell was based out of Kalitta's maintenance base at Oscoda, Michigan.   Mr. Odell requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate his exemption and terminated from his job.  *See* Mr. Odell's Declaration, attached as Exhibit A.

34.    Plaintiff Gregory Michael Pingot was a lead avionics mechanic with Kalitta and lives in East Tawas, Michigan.  Mr. Pingot was based out of Kalitta's maintenance base at Oscoda, Michigan.   Mr. Pingot requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate his exemption and terminated from Kalitta.  *See* Mr. Pingot's Declaration, attached as Exhibit B.

35.    Plaintiff Katie Ann Kotula was a calibration mechanic with Kalitta and lives in Oscoda, Michigan.  Ms. Kotula worked at Kalitta's maintenance base at Oscoda, Michigan.  Ms. Kotula requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate her exemption and terminated from her job.  *See* Ms. Kotula's Declaration, attached as Exhibit C.

17

36.     Plaintiff Connie Joyce Jones was an Air Frame & Power Plant mechanic and inspector with Kalitta who also lives in Oscoda, Michigan.  Ms. Jones worked at Kalitta's maintenance base at Oscoda, Michigan.  Ms. Jones requested a medical accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate her exemption.  Ms. Jones also has a pending religious exemption request on file with Kalitta that the company said could not be submitted due to her submission of a medical request.  She was placed on a one-year leave of absence and forced to seek other employment.  *See* Ms. Jones' Declaration, attached as Exhibit D.

37.     Plaintiff Patricia Lynn Verlander was a dispatcher with Kalitta and lives in Clinton, Michigan.  Ms. Verlander worked at Kalitta's headquarters in Ypsilanti, Michigan.   Ms. Verlander requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate her exemption and terminated from Kalitta.  *See* Ms. Verlander's Declaration, attached as Exhibit E.

38.     Plaintiff Kevin Webber was a 747 Standards Captain with Kalitta, working in the simulator and classroom to train pilots for the company.  Mr. Webber worked at Kalitta's headquarters in Ypsilanti, Michigan.  Mr. Webber requested a religious accommodation from Kalitta's vaccine mandate but was denied based on

the company's alleged inability to accommodate his exemption and terminated from his job. *See* Mr. Webber's Declaration, attached as Exhibit F.

39.    Plaintiff Austin Robert Isaac Hudnutt was a First Officer with Kalitta based out of the company's Cincinnati, Ohio hub.  Mr. Hudnutt requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate his exemption and terminated from Kalitta.  *See* Mr. Hudnutt's Declaration, attached as Exhibit G.

40.    Plaintiff Christian Tougas is a First Officer with Kalitta and lives in Traverse City, Michigan.  Mr. Tougas requested both a medical and a religious accommodation from Kalitta's vaccine mandate.  His request for a medical exemption was denied based on the company's alleged inability to accommodate his exemption—a position the company took in opposition to the third-party recommendation provided by the company Kalitta hired to evaluate requests.  Mr. Tougas's religious exemption request was likewise ignored.  He was placed on a one-year leave of absence and forced to seek other employment.  *See* Mr. Tougas' Declaration, attached as Exhibit H.

41.    Plaintiff Charles Christian Galton is a First Officer with Kalitta and lives in Buckley, Michigan.  Mr. Galton is on medical leave from Kalitta and learned of the company's mandate only after Kalitta's internal deadline for applying for an

exemption had passed (not that such a request would matter). He has been informed by Kalitta's HR Department that he will be terminated immediately upon return from leave due to his inability to take the COVID-19 vaccine because of his sincere religious beliefs. *See* Mr. Galton's Declaration, attached as Exhibit I.

42.      Plaintiff Travis Wayne Robertson was a Flight Maintenance Engineer (FME) with Kalitta and lives in Independence, Missouri. Mr. Robertson was based out of Kalitta's maintenance base at Oscoda, Michigan. Mr. Robertson was entitled to a religious accommodation from Kalitta's vaccine mandate but did not apply for one because (1) Kalitta mandated no accommodations prior to opening the window for employees to ask for one and so all requests were futile; and (2) he feared retaliation from the company (such as not being able to collect unemployment). *See* Mr. Robertson's Declaration, attached as Exhibit J.

43.      Plaintiff Kevin McAllister is a pilot with Kalitta who lives in Cumming, Georgia. Mr. McAllister requested a religious accommodation from Kalitta's vaccine mandate but was denied based on the company's alleged inability to accommodate his exemption. As a result of Kalitta's failure to accommodate, Mr. McAllister was coerced into taking a COVID-19 vaccination in violation of his religious beliefs. *See* Mr. McAllister's Declaration, attached as Exhibit K.

**B.    Defendants**

44.    Defendant Kalitta Air, LLC is a Michigan Limited Liability Company with its headquarters in Ypsilanti, Michigan.  The airline's maintenance, repair, and overhaul facility is at the Oscoda-Wurtsmith Airport in Iosco County, Michigan, and the company maintains a large workforce there.

45.    Defendant Conrad "Connie" Kalitta is the sole owner and Chief Executive Officer of Kalitta Air, LLC, and lives near Ypsilanti, Michigan.  He took personal responsibility for the decisions made regarding Kalitta's handling of the vaccine mandate and the failure to provide employees with reasonable accommodations.

**JURISDICTION AND VENUE**

46.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3).

47.    Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

48.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Kalitta resides in this District and because a substantial part of the events and omissions complained of herein occurred in this District and this Division.

## FACTUAL ALLEGATIONS

**A.     The COVID-19 Pandemic and Response**

49.     By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, spread rapidly around the world.

50.     At that time, Kalitta began implementing certain mitigation procedures for its workforce, including the wearing of masks, maintaining distance from others and participation in temperature checks.   Kalitta also increased the cleaning regimens of its aircraft such as spraying cabins with an anti-viral spray between flights and upgrading its HEPA filters to prevent the spread of COVID-19.

51.     Kalitta pilots and mechanics understood the potential dangers of the virus firsthand.  They were asked to fly rescue flights into Wuhan, China to extract American citizens from the very outset of the pandemic.  Indeed, as "essential employees" under government regulations, Kalitta never stopped flying at any point during the pandemic.

52.     Over the past two years, at least four separate COVID-19 vaccines have been developed and authorized or licensed for use in the United States.  The Food and Drug Administration ("**FDA**") issued an Emergency Use Authorization ("**EUA**") for the Pfizer-BioNTech vaccine on December 1, 2020.  One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.  The FDA

22

issued an EUA for the Johnson & Johnson ("**Janssen**") COVID-19 vaccine on February 27, 2021.  And most recently, the FDA issued an EUA for the Novavax COVID-19 vaccine on July 13, 2022.  The Pfizer-BioNTech vaccine received FDA approval for use in a slightly altered form on August 23, 2021, and is said to be produced as Comirnaty—a form legally distinct from the EUA version.  The Moderna vaccine, Spikevax, has also since received FDA approval.

53.    Subsequent to the development of the vaccines, the Delta and Omicron variants of COVID-19 spread around the world.  In light of those variants, the accompanying increases in transmissibility of the virus, and the significant waning of the vaccines' efficacy, the FDA began recommending booster shots in addition to the initial vaccine regimens proposed.

54.    Studies have shown that the COVID-19 vaccines forced on Kalitta employees wane significantly over time.  Not only has this been confirmed by the CDC, *see* CDC Report, one study showed Pfizer and Moderna efficacy dropping from 6% effectiveness against the Omicron variant in the first two months to -39% at 4 months and -42% at 6 months.  Sarah A. Buchan, *et al.*, *Effectiveness of COVID-19 vaccines against Omicron or Delta infection*, MEDRXIV [preprint] (Jan. 1, 2022),  https://www.medrxiv.org/content/10.1101/2021.12.30.21268565v1  (Table 2).  Another study showed a -76.5% efficacy for Pfizer and a -39.3% efficacy for

Moderna against the Omicron variant.  Christian Holm Hansen, *et al.*, *Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT 162b2 or mRNA-1273 vaccination series: A Danish cohort study*, MEDRXIV [preprint] (Dec. 23, 2021), https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3 (Table). Omicron booster shots have recently been introduced. https://www.yalemedicine.org/news/omicron-booster-covid-19.

55.    Currently, to be "Up to Date" or current with COVID-19 vaccinations, an individual must have received "all doses in the primary series and all boosters recommended for you." *Stay Up to Date with Your COVID-19 Vaccines*, CDC (July 19, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html?s_cid=11305:%2BModerna%20%2B%20%2Bcovid%20%2Bvaccine:sem.b:p:RG:GM:gen:PTN:FY21#footnote02.   For adults, this is a two-shot regimen of the Pfizer or Moderna vaccine or a one-shot dosage of the Janssen or Novavax vaccine, followed by a first booster after the primary series and—for adults over 50 years old—a second booster at least 4 months after the first booster.[1]

---

[1] The recently developed Novavax vaccine has a two-dose initial regime and no recommended booster shots at this time.  It was not approved for use during the implementation of Kalitta's vaccine mandate and is still not approved for use by pilots.

24

56.    All Kalitta employees not terminated (or forced into unpaid leave) because of the company's mandate were vaccinated with either the Pfizer, Moderna, or Janssen vaccine.   Some of these individuals have not received a COVID-19 vaccine in a year or longer.  Booster shots have not been required by Kalitta, despite the CDC's strong recommendation that individuals take boosters in most circumstances.

**B.    Kalitta's Vaccine Mandate and False Accommodation Process**

57.    On October 11, 2021, Kalitta announced that all employees would be required to receive a COVID-19 vaccine.  The company faced tremendous internal resistance, with around half of its employees not wanting to be forced into an experimental medical treatment.

58.    Kalitta pushed back, however, claiming that the new policy was due to federal EO 14042—an EO to which Kalitta was subject.  *See* Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 2021 WL 4148112 (Sept. 9, 2021) ("federal contractor mandate").

59.    EO 14042 required all federal contractors (and their sub-contractors) to mandate COVID-19 vaccinations for their workforces.  While provisions were made in the regulation for religious and medical exemptions, federal contractors would not be allowed to offer a general testing option for everyone (as with the OSHA mandate

issued at the same time).  In line with the EO, Kalitta made its internal deadline for receiving a vaccination December 8, 2021.

60.    After announcing its pending vaccine mandate, Kalitta advised employees that all requests for exemptions were to be submitted by October 31, 2021.

61.    Prior to receiving any exemption requests, however, Kalitta informed its employees that there would be no accommodations given.  Despite EO 14042 (as well as all other federal mandates) containing an express provision for religious and medical exemptions—as any such policy must under federal law—Kalitta claimed to read the Executive Order as an exemption-less mandate.

62.    Kalitta advised employees from the outset that those "who are unable to receive a vaccination, due to a disability or a sincerely held religious belief, can request an accommodation through the Human Resources Department . . . *and will be placed on an unpaid leave effective December 8, 2021*."

63.    On October 15, 2021, employees received a memo from Connie Kalitta indicating that he had consulted with legal firms, White House officials, and lobbyists from Washington, DC.  He had been told that Kalitta would risk loss of

federal contracts if it did not reach a 100% employee vaccination rate and so he was forced to make the decision to force absolute compliance.

64.     On or around November 2, 2021, each person who had formally requested an accommodation received the same general "Dear Team Member" letter responding to that request.  The letter began by reiterating that Kalitta was denying all accommodations because it was bound by EO 14042.

65.     For those requesting a religious accommodation, the letter stated: "Kalitta Air recognizes and respects all *sincerely* held *religious, ethical, moral* and personal beliefs.  Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days. Thereafter, you may voluntarily resign or you will be terminated.**" (Emphasis in original.)

66.     For those requesting a medical accommodation, the letter informed the employee that Kalitta's third-party exemption evaluation company (UNUM, an insurance provider) had approved their request.  Those letters stated: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for twelve (12) months.  Thereafter, you may voluntarily resign or you will be terminated.**" (Emphasis in original.)

67.     Tellingly, Kalitta ignored the recommendation of UNUM that masking could be used as a reasonable accommodation by the company.

68.     Other employees were not even allowed to make it to the denial stage in what is supposed to be an "interactive process" under federal employment law (but which Kalitta foreclosed).  Instead, Kalitta terminated at least one employee when it became aware that the individual—who was exempt from the mandate and entitled to an accommodation—would not succumb to the company's coercion.

69.     Still others exempt from Kalitta's vaccine policy were coerced into taking the vaccine in violation of their beliefs and/or the best interests of their health. Not only have COVID-19 vaccines been shown to exacerbate underlying disabilities, Kalitta's unlawful actions forced many to choose one sincerely held religious belief—providing for one's family—over another sincerely held religious belief.

70.     Kalitta's no-accommodation interpretation of EO 14042 was underscored by the company's refusal of requests from even those employees who were already working entirely remotely.

71.     On November 4, 2021, President Biden extended the deadline of EO 14042 to January 2022 to align with the other federal mandates in place at that time. Kalitta, however, did not extend the deadline for its employees.  The company

instead kept the date as December 8, 2021—the last day that aircraft companies were prevented from firing or furloughing employees if they had received money from Congress under the Payroll Support Program of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

72.     On December 9, 2021—more than a week after EO 14042 was stayed—Kalitta informed its employees that "legal decisions have temporarily prevented the government from seeking to enforce certain vaccination mandates, including those applicable to the Company.  Some of you have asked if those decisions will impact the enforcement of the Company's vaccination policy.  The answer is no."  Having committed to an unlawful course of action, Kalitta refused to change course, even though it was undisputedly no longer required for the company to continue pursuit of its already unlawful interpretation of EO 14042.  Kalitta would not alter the policy despite the court rulings, "particularly [because] nearly all our employees have already complied."

73.     This absolute vaccination-or-termination program differs substantially from every other major airline in the United States.  For example, passenger carriers such as Delta Airlines allowed any employee not wishing to be vaccinated to test once a week at home and provide Delta with a notice that they are negative for COVID-19—*an exemption is not even required*.  Similarly, American Airlines and

Southwest Airlines—after initially stating they would have a vaccination or termination policy—revised their policies to make clear that they would not be firing any employee who refused to get a vaccine. Those employees continued to work at all times during the pandemic with required masking and testing measures in place. The same is true of companies such as UPS, FedEx, and Atlas—all primarily cargo shipping companies like Kalitta.

74.     Even United Airlines—after fighting to keep unvaccinated pilots and flight attendants on unpaid leave from November 2021 to March 2022—determined that its employees could be accommodated with masks and self-testing. Those accommodations have now been modified and United employees have no restrictions except that crewmembers may be prevented from flying to any foreign country that would restrict them based on vaccination status.

75.     Kalitta's policy also differs substantially from the European Union's digital COVID-19 certificate, which considers the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19. *See EU Digital COVID Certificate*, EUROPEAN COMMISSION,                https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en ("Fully vaccinated persons with the EU Digital COVID Certificate should be exempted from

travel-related testing or quarantine 14 days after having received the last dose of a COVID-19 vaccine approved for the entire EU.  The same is true for recovered persons with the certificate.").

76.    Finally, while Kalitta's general vaccine policy was originally in line with EO 14042, that is of no use to Kalitta's policy justifications.  Not only has the federal contractor mandate been stayed for the past nine months, that mandate provides (as it must under federal law) for religious and medical exemptions.  Kalitta is not allowed to provide less protection for its employees than the Executive Order that Kalitta used to justify its policy.

77.    And to be sure, unpaid leave (*i.e.*, constructive termination), followed by formal termination at a future date (the time frame being dependent on whether Kalitta likes the reason an employee applied for an accommodation), is neither reasonable nor an accommodation.  *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* §§ K.1 & K.2., EEOC (May 28, 2021), [https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws](https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws) (providing EEOC guidance for private employers seeking to issue vaccine mandates).

78.    At the same time, allowing unvaccinated individuals to fly on Kalitta planes is not a safety issue (as Kalitta seems to recognize by allowing non-Kalitta

unvaccinated individuals to do so). The statistics show that one's odds of catching COVID-19 on an airplane are virtually zero, with or without a vaccine. The air filtration systems onboard aircraft replace the air continuously and the HEPA filters are highly effective at removing COVID-19 (as the U.S. Department of Defense has shown).

79.    Moreover, Kalitta does not require vaccination from any employee from another airline allowed to ride in the "jumpseat" of the aircraft (in the cockpit) with Kalitta crewmembers. And Kalitta does not perform any special cleaning of aircraft after each flight as it has previously during the pandemic.

80.    Similarly, Kalitta allows unvaccinated workers to work at its Oscoda maintenance facility alongside its own vaccinated workers. Indeed, Kalitta's sister company—Kalitta Charters—shares facilities with Kalitta and does not have a vaccine mandate at all.

81.    Further confirming that Kalitta's actions were not about safety is the fact that the company even terminated employees who worked, or easily could have worked, entirely remotely.

82.    Kalitta also appears to have ignored (and continues to ignore) the science behind the vaccines and COVID-19 transmission. As the CDC recognized in August of 2021, "with regard to severe illness and death, [COVID-19 vaccines]

prevent it.  But what they can't do anymore is prevent transmission."  Statement by

Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5,

2021).

83.     That is why during the pandemic the CDC recommended that "air

carriers consider implementing routine testing of crewmembers to minimize the

likelihood of crewmembers working on aircraft while . . . infected with SARS-CoV-

2."  Safety Alert for Operators (SAFO) 20009, U.S. Dep't of Transp., Fed. Aviation

Admin. (May 25, 2021) (recognizing need for even fully vaccinated air travelers to

be tested when traveling to the United States from a foreign country).  If *safety* is the

goal, testing—not vaccines—is how that is best accomplished.

84.     And all this was true even prior to the spread of the Omicron variant of

COVID-19 during December of 2021 and January of 2022.  The Omicron variant

was even more transmissible than previous variants and it did not matter whether

someone was vaccinated or not.  Unfortunately, COVID-19 vaccines are not a "silver

bullet" to protect employees because vaccines do not significantly decrease

transmission in the workplace.  Upon information and belief, Kalitta's own records

from the relevant timeframes will demonstrate this fact.

85.     Kalitta has not mandated booster shots and there is no requirement to

be "up to date" on vaccines (as defined by the CDC) in Kalitta's mandatory

33

vaccination policy.  It appears that Kalitta only follows CDC guidance when it can be utilized to purge certain disfavored employees.  Kalitta, conveniently, decided to stop "following the science" after it had rid itself of certain disfavored employees.

86.    Unboosted Kalitta employees are at a greater risk of contracting and transmitting COVID-19 than the unvaccinated but naturally immune employees Kalitta forced out of the company, a fact widely known since at least January 2022.

## C.    Federal law prohibiting religious/disability discrimination and retaliation

87.    Title VII prohibits Kalitta from discriminating against employees based on their religion.  42 U.S.C. § 2000e-2(a).  This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

88.    In other words, "[s]hort of an undue hardship on the employer's business, an employer is *required* to make reasonable accommodations for the religious practices of its employees."  *Crider v. Univ. of Tenn., Knoxville*, 492 F.App'x 609, 611-12 (6th Cir. 2012) (emphasis added).

89.    Title VII also prohibits Kalitta from retaliating against an employee for engaging in protected activity.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014).

90.    Similarly, the point of the ADA is that "people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998 (quoting 136 Cong. Rec. S 7422–03, 7347 (daily ed. June 6, 1990)).

91.    "The ADA thus serves to 'prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics.'" *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (quoting *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998)).

92.    Moreover, the ADA prevents discrimination on even the basis of a perceived disability and "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999).  In other words, "[u]nder the

Americans with Disabilities Act, your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not* disabled." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 310–11 (6th Cir. 2019).

93.    The ADA also requires employers to make "reasonable accommodations" for the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

94.    "If the employee establishes that a reasonable accommodation is possible, then the employer bears the burden of proving that the accommodation is unreasonable and imposes an 'undue hardship' on the employer. '[T]he inquiry into reasonableness requires, "a factual determination untethered to the defendant employer's particularized situation," whereas the question of whether a reasonable accommodation imposes an undue burden is evaluated with regard to "the employer's specific situation."'" *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 568 (6th Cir. 2022) (citations omitted).

95.    "To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those

limitations." *Id.*  Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002).  Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith.  *Id.* at 1116.  When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer v. Ft. Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).  While an "interactive-process argument" is not "an independent ground to support an ADA violation beyond standard reasonable-accommodation analysis," *Wardia v. Just. & Pub. Safety Cabinet Dep't of Juv. Just.*, 509 F.App'x 527, 532 (6th Cir. 2013), it demonstrates the defendant's resistance to engaging with the plaintiff on the subject of reasonable accommodations and thus underscores why an accommodation was not provided.

96.    Additionally, the ADA makes it unlawful to retaliate against an employee for seeking an accommodation.  *See* 42 U.S.C. § 12203(a).

97.    Contrary to Kalitta's belief, these statutes are applicable at all times, especially during a pandemic situation like this where employees with disabilities

and who hold sincerely held religious beliefs are particularly vulnerable to employment discrimination.

98.    Indeed, while upholding the federal government's Medicare and Medicaid COVID-19 vaccine mandate, the Supreme Court was careful to point out multiple times that the agency rule allowed exemptions for religious and medical reasons. *Biden v. Missouri*, 142 S. Ct. 647, 650–51 (2022).  Thus, even frontline healthcare workers at medical facilities are entitled to continue working if they "cannot be vaccinated or tested because of an ADA disability, medical condition, or sincerely held religious belief." *Medicare & Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, § 5—Vaccine Exemptions, 86 Fed. Reg. 61555, 61572, 2021 WL 5130520 (Nov. 5, 2021); *see id.* ("Employers must also follow Federal laws protecting employees from retaliation for requesting an exemption on account of religious belief or disability status.").

99.    The federal contractor mandate (EO 14042) was subsequently stayed in federal court.  *See Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. Dec. 7, 2021). The Eleventh Circuit recently upheld that injunction but narrowed the scope with respect to the states in which the EO is enjoined.  (Aug. 26, 2022).

**D.      Plaintiffs' accommodation requests and Kalitta's canned denials**

100.    Each of the named plaintiffs requested a religious accommodation from Kalitta (or was at least entitled to one); Plaintiffs Connie Joyce Jones and Christian Tougas also applied for medical exemptions.   As seen below, every exempt employee was treated to the same false accommodation as Kalitta followed through on its promise of unpaid leave: a false "accommodation" based on shifting, pretextual, and unsupportable rationales.

101.    Kalitta's actions severely injured each of the Plaintiffs beyond just the money from the loss of a job.  The psychological trauma the company put each one of them through is almost indescribable as they were forced for months to face the impossible choice of their livelihoods or their faith/health.  And even those able to find other employment have lost years of seniority and longevity status with their new companies.  They now face things such as undesirable schedules that keep them away from home, working odd hours, or losing weekends off—the loss of privileges that represent years of their lives wasted in attempting career advancement at Kalitta.

**Robert W. Odell, Jr.**

102.    Plaintiff Robert W. Odell, Jr. was a Flight Maintenance Engineer ("**FME**") based out of Kalitta's Michigan headquarters.  *See* Exhibit A.

103.   As an FME, Mr. Odell was the flight mechanic for a designated plane in Kalitta's fleet.  Mr. Odell flew with the aircraft, wherever it went, to fix anything on it at any time.  Throughout his time at Kalitta, no proof of any vaccine was ever required at any time, even though he worked for the company around the world— from the Middle East to Indonesia to Central America to Africa (on Ebola trips).

104.   At the outset of the COVID-19 pandemic, Mr. Odell was on a plane tasked with transporting Department of State VIPs out of Wuhan, China and back to the United States.  As the first aircraft to do this, his crew worked with the CDC on an Airborne Biological Containment System (ABCS) installed on his plane to prevent the spread of COVID-19.  This was in addition to the HEPA filters on all Kalitta planes that effectively filter onboard air.

105.   Mr. Odell continued to fly similar missions throughout the pandemic, rescuing and transporting U.S. personnel from the Diamond Princess cruise ship out of Japan and from the Grand Princess ship in California to the United Kingdom.  He also helped transport VIPs out of Africa and back to Dulles International Airport outside of Washington, D.C.  Over the course of several months near the outset of the pandemic, he assisted with the transport of hundreds of COVID-19 patients around the world.

106.   During that time, his aircraft—and even crewmembers—would be sprayed with anti-viral chemicals upon arrival back in Oscoda.

107.   After some time had passed, Kalitta's safety measures were relaxed. For example, employees were told to wear masks at the Oscoda facility, but that policy was never strictly enforced.   (The mask policy was rescinded for all employees on June 22, 2021.)  In another example, Mr. Odell was notified by Kalitta in August of 2021 that he had been in contact with another crew member who tested positive for COVID-19.  He was not required to take a COVID test but merely asked to self-monitor for symptoms.

108.   Kalitta's discrimination against unvaccinated employees began on May 25, 2021.  At that point, after previously not requiring employees to use sick time when recovering from COVID-19, a new policy was implemented that "any employee diagnosed with COVID-19 who is NOT fully vaccinated, or who has NOT initiated the vaccination process must follow the company's standard leave of absence and will no longer remain on full pay."  This policy was left in place even though the CDC recognized in August of 2021 that vaccinated individuals could still contract and transmit COVID.

109.   On October 11, 2021, Mr. Odell received a notice regarding the federal guidance on the COVID-19 pandemic and the recently released vaccination

requirements of EO 14042 (the federal contractor mandate).  It stated that Kalitta would be following the EO.

110.   The October 11 letter also advised that employees "who are unable to receive a vaccination, due to a disability or a sincerely held religious belief, can request an accommodation through the Human Resources Department . . . by October 31, 2021, *and will be placed on an unpaid leave effective December 8, 2021*."

111.   On October 15, 2021, Mr. Odell received the memo from Connie Kalitta indicating that he had consulted with legal firms, White House officials, and lobbyists from Washington, DC and had been told Kalitta would risk loss of federal contracts if it did not reach 100% vaccination.  Therefore Mr. Kalitta had made the personal decision to violate Title VII and the ADA.  Mr. Kalitta decided to require vaccines and to allow no accommodations, even when required.

112.   Mr. Odell submitted a request for a reasonable accommodation on October 27, 2021 based on his sincerely held religious beliefs.  As a Christian, he believes the Bible teaches that abortion is a sin.  Because the vaccines for COVID-19 each either contain or were tested on fetal stem cell lines, it would violate his conscience to take one of them.  He also explained his religious belief that his body

is the temple of the Holy Spirit and that God did not want him to inject something into his body that has been shown to have toxins in it.

113.    On November 2, 2021, Mr. Odell received a generic "Dear Team Member" letter responding to his request for an accommodation.  It began by stating that Kalitta was bound by EO 14042 because of its federal contracts.  It also acknowledged his sincerely held beliefs and stated: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days.  Thereafter, you may voluntarily resign or you will be terminated.**"  The letter concluded by stating that the company would begin seeking to fill his position after November 24, 2021 if he still refused to get the COVID-19 vaccine by that date.

114.    In other words, while Kalitta claimed to "recognize[] and respect[] all sincerely held religious . . . beliefs," Mr. Odell's "accommodation" was to be termination.  Critically, Kalitta has never challenged the sincerity of Mr. Odell's religious beliefs that prevent him from receiving a COVID-19 vaccine.  While recognizing his beliefs, Kalitta hardly respected them.

115.    Attached to the "Approval" letter was an FAQ document that admitted the company was even forcing those working fully remotely to be vaccinated (though Kalitta would not require those employees to wear face coverings or socially

distance while working at home).  The FAQ also curiously noted that employees with a prior COVID-19 infection were required to be vaccinated "unless granted an approved medical or religious accommodation by the company," reinforcing the company's commitment of requiring an immunization method that would either violate many of its employees' religious beliefs or exacerbate pre-existing disabilities.  As it turned out, even those "granted an approved medial or religious accommodation by the company" were required to be vaccinated if they wanted to keep their jobs.

116.   On December 8, 2021, Kalitta took Mr. Odell off his aircraft during a trip and flew him back to Michigan to begin his unpaid "leave."  He filed for unemployment benefits that same day.  The company had previously indicated that it would not contest unemployment benefits and had stated that Kalitta would simply inform the Michigan Unemployment Office that anyone unable to take the vaccine was on unpaid leave for failure to vaccinate.

117.   From December 8, 2021 to March 10, 2022, Kalitta contested Mr. Odell's unemployment benefits because, as they told the Michigan UI Department, he was on a leave of absence from the company and not yet terminated so should not be paid any unemployment benefits.

118. Mr. Odell disputed Kalitta's actions with regard to withholding unemployment benefits and he was granted a hearing before an ALJ at the Michigan Office of Administrative Hearings.

119. After learning that the so-called accommodation from Kalitta was an unpaid (and company-forced) leave of absence *and* that Kalitta's so-called accommodation was pre-determined before any requests were even made, the ALJ ruled in Mr. Odell's favor that Kalitta should pay his unemployment benefits.

120. Immediately following the decision of the ALJ, rather than follow the judge's order, Kalitta contacted the Michigan unemployment department and asked for a redetermination of Mr. Odell's unemployment status. Kalitta said that his file should be changed to reflect that he was fired for "misconduct" and that he should not receive unemployment benefits because his firing was a disciplinary termination for refusing to comply with company policy (*i.e.*, not receiving the COVID-19 vaccination that would have violated his religious beliefs).

121. Upon information and belief, Kalitta did not contest the benefits of any employee who did not file for a religious exemption but was merely terminated under the company's vaccine policy. Kalitta did, however, attempt to contest the benefits of employees on medical exemptions once the company learned of EEOC charges against them by those on the 12-month medical leave.

45

122.   If Kalitta had engaged in an interactive process with Mr. Odell, the company would have learned that vaccination was unnecessary for him because of his prior COVID-19 infection; an appropriate accommodation could have been a simple exemption from the job requirement.  As the CDC has confirmed, a prior infection provides protection superior to a vaccine.  He also would have been open to paying for regular testing that would have allowed him to continue working safely (and even more safely than Kalitta had previously operated throughout the pandemic) and even suggested that to the company.

123.   Mr. Odell even suggested to HR Director Laurie Stockton that he would have been willing to go back to wearing masks—the same mitigation measure the company had previously suggested made employees safe to work during the pandemic.  She told him that was not allowed specifically because of EO 14042 and federal guidance.

124.   The misdirection being deployed by Kalitta regarding EO 14042 was apparent from the example provided by numerous companies in the industry who allowed unvaccinated employees to continue working, even in the face of the federal contractor mandate.

125.   Mr. Odell was a committed employee for Kalitta for over 14 years, devoting his entire life to the company.  In the two years prior to his termination, he

had averaged only 90 days or less at home each year, missing holidays, birthdays, and anniversaries with family. Unsurprisingly, because of his exceptional performance record and commitment to the company, Mr. Odell had received consistently positive feedback for his performance. It was only after Kalitta learned of his religious beliefs against COVID-19 vaccination that he experienced any adverse employment action.

126. To be fired, and then denied unemployment, right before Christmas last year was traumatic, but the devastating toll on his family from Kalitta's actions goes far beyond the money Kalitta took. Mr. Odell's wife originally encouraged him to stand up for his religious beliefs and not give in to the company's coercion. The past nine months of stress, anxiety, and depression caused by losing his job and being unable to provide for his family, however, has directly led to Mr. Odell being in the midst of a divorce. Kalitta's unlawful actions have had long-reaching, terrible effects that will endure for the rest of Mr. Odell's life.

**Gregory Michael Pingot**

127. Plaintiff Gregory Michael Pingot was a lead mechanic in the avionics department of Kalitta at the Oscoda-Wurtsmith Airport, overseeing a team responsible for the maintenance and repair of the aviation electronics on Kalitta's airplanes. *See* Exhibit B.

47

128.   As an essential employee under federal law, Mr. Pingot worked throughout the entire pandemic, only taking time off when he contracted and recovered from COVID-19.   He worked on planes flying back and forth from Wuhan, China—the epicenter of the pandemic—to ensure compliance with FAA regulations.

129.   On October 11, 2021, Mr. Pingot received the notice regarding EO 14042 (the federal contractor mandate) that also warned that anyone "unable to receive a vaccination, due to a disability or a sincerely held religious belief, can request an accommodation through the Human Resources Department . . . by October 31, 2021, *and will be placed on an unpaid leave effective December 8, 2021*."

130.   Mr. Pingot attended a meeting with Kalitta executive board members on October 14, 2021.  This meeting included HR Director Laurie Stockton and Chief Operating Officer Pete Sanderlin.  At that time, the board noted its fear of the vast amount of business Kalitta would lose if it did not comply with the EO but stated that Kalitta would not contest unemployment claims for those who were terminated for refusing the vaccine.

131.   The following day—October 15, 2021—Mr. Pingot received the memo from Connie Kalitta indicating he had been forced to decide on a 100% vaccination

policy.  Mr. Kalitta informed employees that "[i]f I elect not to comply [with EO 14042], Kalitta Air will be prevented from doing business with companies such as: Boeing, General Electric, Pratt & Whitney, Kalitta Charters II, Omni, Western Global, Fed Ex, UPS, DoD, FEMA, DoS, and others. . . . I have been forced to recognize that we must comply, or jeopardize the survival of the company."

132.  Mr. Kalitta never recognized, however, that *none* of those private companies he named ever forced a vaccination mandate on their employees, let alone attempted to enforce a mandate without accommodations.

133.  In fact, even Kalitta's sister company—Kalitta Charters—which shares facilities with Kalitta, never imposed a vaccine mandate (let alone force out employees entitled to religious and medical exemptions).  This is so despite the fact that Kalitta employees—like Mr. Pingot—work daily with and around Kalitta Charters employees.

134.  But as demonstrated by Kalitta's refusal to reconsider its position either after the Administration delayed implementation of EO 14042 or after EO 14042 was stayed, the company's purported reliance on the federal contractor mandate— like its later arguments regarding safety—was merely pretextual rationalization for forcing out unvaccinated employees.  The company was determined to force out

exempt employees as though something was constantly wrong with anyone who had not taken a vaccine.

135. Mr. Pingot submitted a request for a reasonable accommodation on October 27, 2021, based on his sincerely held religious beliefs. As a faithful Christian (Lutheran/Catholic), it is his religious conviction that abortion is a sin. Because the vaccines for COVID-19 each either contain or were tested on fetal stem cell lines, he was unable to take them because it would be material cooperation with the taking of human life. He also explained to the company that God was specifically directing him to avoid the vaccine.

136. On November 2, 2021, Mr. Pingot received the generic "Dear Team Member" letter responding to his request for an accommodation. After acknowledging Mr. Pingot's sincerely held beliefs, the letter stated: "Your exemption is **APPROVED. Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days. Thereafter, you may voluntarily resign or you will be terminated.**"

137. On December 8, 2021, Mr. Pingot's supervisor filled out termination forms for all unvaccinated employees at the Oscoda facility. He was then required to turn in all Kalitta property, *i.e.* I.D. badge, credit cards, cell phones, parking passes, sign-off stamps, etc.—even though his so-called accommodation was

50

supposed to be a leave of absence and Kalitta property is never taken from employees on leave. Security then escorted Mr. Pingot off the premises as is done with employees who are fired.

138. On December 10, 2021, Mr. Pingot filed a claim for unemployment insurance. Over the next seven months, he filed multiple claims and protests—both in person at the East Tawas and Saginaw offices and online at the MiWam website—without ever receiving any unemployment compensation. Finally, on July 19, 2022, Mr. Pingot received a Notice of Determination stating that he was being denied unemployment benefits because Kalitta had told the agency that he "Voluntary Quit – Personal Reasons." This took place even after Kalitta's promise not to contest unemployment benefits over its vaccine mandate.

139. Had Kalitta engaged in an interactive process with Mr. Pingot, the company would have learned that vaccination was unnecessary for him because of his prior COVID-19 infection—an appropriate accommodation would have been a simple exemption from the job requirement. As the CDC has confirmed, a prior infection provides protection superior to a vaccine. He also would have been open to regular testing that would have allowed him to continue working safely (and even more safely than Kalitta had previously operated throughout the pandemic). Moreover, Mr. Pingot suggested to Ms. Stockton that he would have been willing to

go back to wearing a mask—a mitigation measure the company had always said previously kept employees safe.

140.   Mr. Pingot's personnel file confirms that Kalitta enacted its no-accommodation policy based on the pretext of EO 14042.  The paperwork related to his request for a religious exemption states that his proposed requested accommodation was "DENIED" and that the reason "why an alternative accommodation is not available for this request" was because of "Executive Order 14042."   The company disregarded the fact that EO 14042 itself allows for accommodations (as it must under federal law) and then disregarded the fact that EO 14042 was delayed and later stayed.  If EO 14042 was not going to be in effect starting December 8, 2021, Kalitta's supposed reason for denying Mr. Pingot an accommodation had already evaporated, leaving behind the true motivation for his termination (religious discrimination).

141.   Kalitta's unlawful actions have taken a tremendous toll on Mr. Pingot and his family.  In addition to the loss of income, Mr. Pingot has experienced needless psychological stress and chronic sleeplessness due to Kalitta's unwillingness either to follow federal employment law or admit its mistake in the face of clear vaccine shortcomings and an injunction against EO 14042.

52

**Katie Ann Kotula**

142.   Plaintiff Katie Ann Kotula was an employee of Kalitta working at the company's maintenance facility at the Oscoda-Wurtsmith Airport as a calibration mechanic.  As a certified metrologist, her job was to check the calibration of the equipment on Kalitta's airplanes.  *See* Exhibit C.

143.   As an essential employee, she worked constantly throughout the pandemic, including on the planes flying to and from Wuhan, China.

144.   Ms. Kotula was told to wear a mask while working during that time and complied with company policy, but that policy was never strictly enforced.

145.   When Kalitta announced on October 11, 2021, that the company would be following EO 14042, but with the exception that Kalitta would deny every exemption request, Ms. Kotula began seeking answers from her superiors as to why no accommodation could be given.

146.   Over the next several days, Ms. Kotula was continually given incorrect information about the mandate and Kalitta's obligations under it.  Looking to lay the responsibility at the feet of others, she was incorrectly told that Kalitta was "not advocating any specific vaccine; we are following a mandate that was given to us. All major airlines are required to abide by this – we know it's hard, and it was a hard pill to swallow for us also."

53

147.   Ms. Kotula pointed out that EO 14042 was still in flux and that she had already recovered from a severe COVID-19 infection—one that almost killed her husband at the same time.

148.   While she did not formally submit a religious accommodation request to Kalitta, Ms. Kotula informed HR at that time that God would not approve of her taking the vaccine due to its ties to abortion and fetal stem cell lines.  Abortion is a grave sin in Ms. Kotula's religion, and therefore she would need an actual exemption due to her sincerely held religious beliefs.

149.   On October 14, 2021, Ms. Kotula was called to her supervisor's office for a conference call with Laurie Stockton—an attorney in charge of HR at Kalitta— along with Ms. Kotula's supervisor's boss.  She was first reprimanded for the wrong belief of management that Ms. Kotula had begun a protest at the Oscoda facility against the mandate.  After clarifying that she did not start the protest, Ms. Kotula informed her superiors that she would never take the vaccine due to her sincerely held religious beliefs.

150.   Ms. Stockton stressed that Kalitta was being forced to implement the mandate "because of Biden" and that Kalitta would be providing the "accommodation" of unpaid leave.  When Ms. Kotula responded that unpaid leave was not an actual accommodation, management replied that Kalitta would lose its

government contracts if the company was not "100% vaccinated with no exceptions." Ms. Kotula advised her supervisors that they would end up having to fire her in the end if they were not going to provide a reasonable accommodation for her sincerely held religious beliefs.

151.    Seeing that Ms. Kotula could not be coerced into taking the vaccine, and fearing that she might rally others against the company's unlawful actions, management terminated her immediately for seeking an accommodation, even before any interactive process had a chance to begin. Management was determined to silence any dissenting voices so that its coercive measures would be more effective.

152.    Kalitta's unlawful actions have caused tremendous injury to Ms. Kotula and her family. She was a dependable and loyal employee for Kalitta, and her firing has been humiliating as it is the only time she has ever been fired from a job in her life. In addition to the loss of income just before the holidays, the contention at home over her loss of employment has been tremendous. She and her husband both had COVID in March of 2021; he almost died from it at the time and it has affected his ability to work. The family has thus depended heavily on Ms. Kotula's income and Kalitta's unlawful actions placed them in a difficult situation. Ms. Kotula's stress has only increased as she must now drive two hours to work each day at a new job

in Atlanta, Michigan.  The Kotulas were also forced to refinance their home and lose equity in order to make ends meet.

**Connie Joyce Jones**

153.   Plaintiff Connie Joyce Jones was an Air Frame Power Plant  mechanic for the past 30 years and has worked for Kalitta off and on for around 17 years.  She was previously a sheet metal mechanic and a team lead.  Most recently, she worked as an inspector, checking aircraft for any damage to ensure that they are safe to fly. *See* Exhibit D.

154.   As an essential employee, she worked constantly throughout the pandemic, including on the planes flying to and from Wuhan, China.

155.   Ms. Jones was told to wear a mask while working during that time and complied with company policy, but that policy was never strictly enforced.

156.   On October 11, 2021, Ms. Jones received a notice regarding the federal guidance on the COVID-19 pandemic and the recently-released vaccination requirements of EO 14042 (the federal contractor mandate).  The letter stated that Kalitta would be following EO 14042.

157.   The October 11 letter also advised that employees "who are unable to receive a vaccination, due to a disability or a sincerely held religious belief, can request an accommodation through the Human Resources Department . . . by

October 31, 2021, *and will be placed on an unpaid leave effective December 8, 2021.*"

158.  Ms. Jones submitted a request for a reasonable accommodation on October 13, 2021, based on an allergy disability that makes her unable to receive the vaccine.  Her allergies are severe and disabling: she takes multiple medicines each day, sees her allergist once a month, gets allergy shots throughout the year, and constantly carries an inhaler for asthma as well as two separate nose sprays.  Ms. Jones must constantly be alert for environmental triggers as even small things such as smells can cause an attack that leaves her unable to function.  As an example, she was once out of work for a month due to a severe allergic reaction.  Ms. Jones has been living with her severe allergies for decades and they do not subside except with medication.

159.  Given her allergy disability, Ms. Jones specifically discussed the COVID-19 vaccines with her doctor who found that she was unable to take one.  He specifically tested Ms. Jones to see if she could take any of the vaccines and determined that the answer was no.  At that time, Ms. Jones also had a COVID antibody test that confirmed a prior infection.

160.  On November 2, 2021, Ms. Jones received the generic "Dear Team Member" letter responding to her request for an accommodation that others received.

It acknowledged her application for a medical exemption and stated: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for twelve (12) months.  Thereafter, you may voluntarily resign or you will be terminated.**"

161.   Attached to the "Approval" letter was an FAQ document that admitted the company was even forcing those working fully remotely to be vaccinated.

162.   On December 8, 2021, she was required to turn in all Kalitta property, *i.e.* I.D. badge, credit cards, cell phones, parking passes, sign-off stamps, etc. even though she was supposedly only being placed on leave.

163.   Treating Ms. Jones as though she had a disability because she did not take a COVID vaccine, and ignoring the need for an accommodation for the disability she did have, Kalitta placed her on unpaid leave starting December 9, 2021.

164.   Ms. Jones filed a claim for unemployment insurance and began receiving it on January 9, 2022.  Unlike the employees who sought a religious exemption, her unemployment claim was not contested and she received 20 weeks of partial pay while searching for another job.

165.   After she was placed on unpaid leave, Ms. Jones also informed Kalitta of her need for a religious exemption as well.  Based on faith and prayer, it is her

sincere religious belief that God does not want her to take one of the COVID-19 vaccines and that it would harm her to do so. She also maintains a sincere religious belief that prohibits her from taking a vaccine developed through the use of fetal stem cell lines. Ms. Jones had been told previously that she could not submit both a medical and a religious accommodation request and so did not do so initially. She was able to avoid some of the retaliation taken against religious requesters, though, by not submitting her religious accommodation request to Kalitta until much later.

166. If Kalitta had engaged with Ms. Jones in an interactive process, the company would have learned that vaccination was unnecessary for her due to a prior COVID-19 infection. An appropriate accommodation would have been a simple exemption from the vaccine, as confirmed by the CDC. *See* CDC Report.

167. On information and belief, UNUM—the third-party hired by Kalitta to process medical exemption requests—recommended that Kalitta provide her with an accommodation and that Kalitta had the ability to do so.

168. Kalitta's unlawful actions have caused tremendous stress for Ms. Jones, robbing her of a job just before Christmas last year and forcing her to pay out of pocket for the health insurance she desperately needs for her disability. Moreover, it has strained her family relationships as she is no longer able to help pay for her daughter's schooling and insurance. Without her mother's help, Ms. Jones's

daughter had to make the difficult choice to forego her dream of going to law school. The emotion and mental strain over the past year has been tremendous as Ms. Jones has struggled to replace her job at Kalitta.

### Patricia Lynn Verlander

169.   Plaintiff Patricia Lynn Verlander was a dispatcher for Kalitta working at the company's headquarters in Ypsilanti, Michigan.  After a career in the Army and with the FAA, she worked for Kalitta from 2008 until December 8, 2021.  *See* Exhibit E.

170.   As a dispatcher, Ms. Verlander's job was to provide flight plans to crews based on factors such as the weather and to calculate things such as duty times and fuel needs for aircraft.  She would design and manage custom routes daily for 3 to 8 aircraft.

171.   The dispatch office where Ms. Verlander worked at Kalitta was a very large room.  There would be four or five dispatchers—along with a few support personnel—working in that room during her shifts and their desks were spread far apart (more than the 6 feet recommended by the CDC).

172.   As an essential employee, Ms. Verlander worked throughout the pandemic.  When working in person, Ms. Verlander and other employees in the dispatch room were told to wear masks, to wipe down desks after use, and to perform

temperature checks prior to coming to work.  Those protocols were phased out and Kalitta no longer required masks after June of 2021.

173.   On October 11, 2021, Ms. Verlander received the notice that Kalitta would force employees to be vaccinated under the recently-released federal contractor mandate and that employees unable to take the vaccine for even an approved reason "*will be placed on an unpaid leave effective December 8, 2021.*"

174.   On October 15, 2021, Ms. Verlander received the memo from Connie Kalitta indicating that he had been essentially forced to impose a 100% vaccination policy.

175.   Ms. Verlander submitted a request for a reasonable accommodation on October 27, 2021, based on her sincerely held religious beliefs.  Ms. Verlander is a devout Catholic and a very spiritual person.  It would have violated her conscience to participate in the use of vaccines that were premised on the destruction of a fetus.  She also prayed earnestly about the vaccine and felt God specifically directing her not to take it as part of her spiritual journey.  In line with her spiritual beliefs, she has not had any vaccines since leaving the military decades ago.  Critically, Kalitta never challenged the sincerity of Ms. Verlander's religious beliefs that prevent her from receiving a COVID-19 vaccine.

176.   On November 2, 2021, Ms. Verlander received the familiar "Dear Team Member" letter responding to her request for an accommodation.  It acknowledged Ms. Verlander's sincerely held beliefs and stated: "Your exemption is **APPROVED. Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days.  Thereafter, you may voluntarily resign or you will be terminated.**"

177.   In other words, while Kalitta claimed to "recognize[] and respect[] all sincerely held religious . . . beliefs," Ms. Verlander's "accommodation" was termination.

178.   When Kalitta refused to extend the deadline for its employees—even though EO 1042 had been delayed and then stayed—Ms. Verlander was informed on December 8, 2021, that she could no longer come to work at Kalitta.

179.   Tellingly, although Kalitta *Air* claimed that it could not accommodate Ms. Verlander's religious beliefs, Kalitta's sister company Kalitta *Charters*—also based out of the same airport in Ypsilanti—almost immediately offered her a job doing the same thing (though making substantially less money and losing both vacation time and seniority benefits).  She was forced to formally resign from Kalitta on December 20, 2021, in order to start her job at Kalitta Charters on December 26, 2021.

180.   If Kalitta had engaged in an interactive process with Ms. Verlander, the company would have also learned that vaccination was unnecessary for her because of her prior COVID-19 infection in the Spring of 2021 (as confirmed by antibodies). An appropriate accommodation for Ms. Verlander would have been a simple exemption from the vaccine requirement.

181.   Ms. Verlander also would have been open to regular testing—even testing for which she paid—that would have allowed her to continue working safely (and even more safely than Kalitta had previously operated throughout the pandemic).   Alternatively, she would have worn a mask and maintained social distancing at work (as her position allowed) or worked remotely (as her position also would have allowed and as she currently works for another company doing the same task she performed for Kalitta).

182.   Kalitta's actions—including treating Ms. Verlander as if she had a COVID disability because she did not take a vaccine—have injured her in multiple ways.  After working as a dedicated employee for 13 years, she has been forced back to midnight shifts because of her loss of seniority in addition to losing a significant amount of pay.

**Kevin Webber**

183.   Plaintiff Kevin Webber was a Standards Captain on the 747 for Kalitta. He has almost 30 years of experience in the industry and had been with Kalitta for 11 years. *See* Exhibit F.

184.   As a Standards Captain, Mr. Webber's job was to ensure that Kalitta pilots maintained federal regulatory compliance and met company performance standards.   He would also make flights for the company on occasion, either to perform a "Line Check" or to help fill a spot in the schedule.  Mr. Webber's primary administrative and teaching roles were performed at the company's headquarters in Ypsilanti, Michigan.

185.   Mr. Webber flew missions to pick up people overseas—in Japan, Armenia, Qatar, Tajikistan, Afghanistan, Bulgaria, Ukraine, and Cameroon—who had contracted COVID-19 as well as others who needed to be flown back to the United States immediately.   On those trips, the Kalitta planes would be equipped with what were essentially mobile hospital rooms set up to handle infectious disease patients.

186.   This was unique since Kalitta normally flies only cargo.  The Kalitta employees on-board a flight will usually be the pilot, the co-pilot, a relief pilot, and a flight mechanic.   The only other people will be any "jumpseaters"—non-

crewmembers (often from other airlines) who are catching a ride to work at another airport on-board a Kalitta flight.

187.  While working in-person at the Ypsilanti headquarters during the pandemic, Mr. Webber was told to wear a mask, but that policy was only enforced at the outset of the pandemic.  The mask policy, along with other COVID protocols, were phased out over time and employees stopped wearing masks altogether around June or July of 2021 (during the height of the Delta wave).

188.  Mr. Webber had the same experience with Kalitta's cavalier approach to safety throughout the pandemic, experiencing firsthand instances of the company bypassing its COVID protocols in order to make a flight schedule work.

189.  On October 11, 2021, Mr. Webber received the new vaccine policy notice received by others.

190.  On October 15, 2021, Mr. Webber also received the memo from Connie Kalitta indicating that Mr. Kalitta had made the personal decision to require vaccinations and to allow no exceptions—"I did not come to this decision lightly . . . [but] government contracts require that all my employees are to be vaccinated."

191.  Mr. Webber submitted a request for a reasonable accommodation on October 28, 2021, based on his sincerely held religious beliefs.  As a faithful Christian, he is guided by God's Word—the Bible—and attempts to live by the

Scriptural command to regard one's body as the temple of the Holy Spirit.  Mr. Webber prayed about the vaccine and was under conviction that it would be defiling God's temple to take the vaccine.

192.   Although it was clear the company had no intention of considering an accommodation for Mr. Webber, he affirmatively volunteered to test in lieu of taking the vaccine—a measure known to better prevent COVID-19 transmission than vaccination.  He would have even been willing to pay for the testing.

193.   On November 2, 2021, Mr. Webber received the same generic "Dear Team Member" letter that everyone else requesting an exemption was sent.  After acknowledging Mr. Webber's sincerely held beliefs, the letter stated: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days.  Thereafter, you may voluntarily resign or you will be terminated.**"

194.   Attached to the "Approval" letter was an FAQ document that admitted the company was even forcing those working fully remotely to be vaccinated.

195.   Kalitta has never challenged the sincerity of Mr. Webber's religious beliefs that prevent him from receiving a COVID-19 vaccine.

196.    Treating Mr. Webber as though he had some sort of disability—even though he clearly did not—Kalitta placed him on unpaid leave starting December 9, 2021.

197.    Shortly afterward, the company threatened to fine Mr. Webber $2500 if he did not return his company property—iPad, iPhone, badge, etc.—immediately upon starting the leave on December 9.  Kalitta did this even though it does not take company property from other pilots on leave because they are expected to maintain current status with notifications and trainings from the company and/or FAA and they need their company property in order to keep up with those requirements.

198.    And because Kalitta wanted to force out any unvaccinated employee, even those who could not take the shot for religious or medical reasons, the company continued terminating exempt employees even though Kalitta makes accommodations all the time: whether it is allowing unvaccinated jumpseaters from other airlines to fly with Kalitta crews or adjusting schedules for its own employees who have difficulties regarding which countries they may enter.  For instance, there are as many as 50 employees in the company with no Chinese visa who must not be scheduled to travel to China.  Similarly, Kalitta constantly works around sending any employee to Canada with a prior felony on their record.

199.   If Kalitta had engaged with Mr. Webber in an interactive process, the company would have learned that vaccination was unnecessary for him due to a prior COVID-19 infection.   An appropriate accommodation would have been a simple exemption from the vaccine (as confirmed by the CDC).  *See* CDC Report.

200.   The personal challenges throughout this ordeal for Mr. Webber have been mental, emotional, and financial.  The result of being terminated from a lifelong career is devastating.  He also lost friends over his vaccination beliefs and long-time colleagues who did not want to be seen as not toeing the company line stopped calling or interacting with him.  This led to feelings of isolation and depression.  The financial impact has also been difficult as he was forced to deplete personal savings while searching for employment.  The FAA's regulatory requirement to retire at age 65 also makes finding a job with commensurate compensation difficult because of the short duration of available employment time and this, in turn, decreases his ability to contribute to a personal retirement account for the future.

### **Austin Robert Isaac Hudnutt**

201.   Plaintiff Austin Robert Isaac Hudnutt was a First Officer on the Boeing 747 for Kalitta.  *See* Exhibit G.

202.   As an essential employee under federal law, Mr. Hudnutt flew for the company throughout the entire pandemic after he was hired in 2020.  When the

vaccination policy was implemented at Kalitta, Mr. Hudnutt was still on probationary status with the company and not a member of ALPA—the pilots' union at Kalitta.

203.   On October 11, 2021, he received the notice regarding Kalitta's new position regarding EO 14042.

204.   Not only did the October 11 letter advise that no true accommodation would be given, the lack of an interactive process was personally stressed to Mr. Hudnutt.  His supervisor informed him directly that "if you don't get the vax, we don't have a place for you—period."

205.   Mr. Hudnutt also received the October 15, 2021 memo from Connie Kalitta indicating Mr. Kalitta's personal decision to require vaccinations and to allow no exceptions.

206.   Mr. Hudnutt submitted a request for a reasonable accommodation on October 28, 2021, based on his sincerely held religious beliefs.  As a faithful Christian, he is guided by God's Word—the Bible—and takes seriously the Scriptural command to regard one's body as the temple of the Holy Spirit.  Mr. Hudnutt prayed earnestly about the vaccine and felt that it would be defiling God's temple to take the vaccine.  He also came to learn during 2021 that the vaccines each

either contained or were tested on aborted fetal stem cell lines.  Because of his belief that God does not approve of abortion, he could not participate in taking the vaccine.

207.   On November 2, 2021, Mr. Hudnutt received his generic "Dear Team Member" letter stating: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days.  Thereafter, you may voluntarily resign or you will be terminated.**"

208.   Shortly afterward, the company threatened to fine Mr. Hudnutt $2500 if he did not return company property—iPad, iPhone, badge, KCM Badge (that allows jumpseating on other airlines), and credit card—within 10 days of starting unpaid leave.  This is something that has never been required of a company employee on "leave" of any sort.

209.   Even after EO 14042 was delayed in implementation by the federal government and then stayed in federal court, Kalitta refused to change course "particularly [because] nearly all our employees have already complied."   Mr. Hudnutt has confirmed that this same sentiment was reiterated to employees in March of 2022, shortly after Kalitta formally terminated employees who had been on unpaid leave for 90 days.  Kalitta's Vice President of Flight Operations—Bill Rhodes—told those in a new hire class that bringing unvaccinated employees back "would not be fair to those who caved and got the shot."   In other words, Kalitta

supposedly could not bring employees back because management would have to answer to those the company had coerced into taking the vaccine.

210.   Interestingly, after Kalitta instituted its 100% vaccination policy, the company stated that no unvaccinated jumpseaters would be allowed on its planes. Mr. Hudnutt came to learn that the jumpseater policy lasted about three hours as the other airlines and unions told Kalitta this would be unacceptable and that they must accommodate all jumpseaters—even unvaccinated ones.  Kalitta pulled back the policy immediately and has allowed unvaccinated individuals from other airlines to fly on its planes since December 8, 2021.  Those unvaccinated employees are not even required to meet the alternative mitigation measures (like testing or masks) that accommodated employees at Kalitta like Mr. Hudnutt would have been willing to do.

211.   If Kalitta had engaged in an interactive process with Mr. Hudnutt, the company would have learned that vaccination is unnecessary for him because of his prior COVID-19 infection—an appropriate accommodation could have been a simple exemption from the job requirement.  As the CDC has confirmed, a prior infection provides protection superior to a vaccine.  He also would have been open to regular testing that would have allowed him to continue working safely (and even

more safely than Kalitta had previously operated throughout the pandemic) and even suggested that to the company.

212.   Mr. Hudnutt would have also been willing to let Kalitta alter his flying schedule as needed to accommodate any foreign country restrictions.  Kalitta has a long history of working schedules around countries to which pilots or mechanics cannot travel.  For instance, there are as many as 50 employees in the company with no Chinese visa who must not be scheduled to travel to China.  Likewise, Kalitta constantly works around sending any employee to Canada with a prior felony on their record.  Avoiding certain countries for trips is built in to the Kalitta system.  Consequently, Mr. Hudnutt would have posed no burden on Kalitta's operations whatsoever.

213.   Kalitta's unlawful actions have taken a tremendous personal toll on Mr. Hudnutt.  He had just purchased a home and gotten engaged when Kalitta informed employees that it would not be following federal employment law regarding accommodations.  Mr. Hudnutt was forced to take a job making a fraction of his previous salary and has barely been able to make payments on his home in the interim—he may yet be unable to afford his new home.  Moreover, the stress related to Kalitta's unwillingness to follow either the law or the science led directly to him and his fiancé calling off their wedding.

## Christian Tougas

214.   Plaintiff Christian Tougas is a First Officer on the 747 for Kalitta from Traverse City, Michigan.  *See* Exhibit H.

215.   As an essential employee under federal law, Mr. Tougas flew for the company throughout the entire pandemic, including participating in the rescue flights going to Wuhan, China.

216.   In October of 2021, Mr. Tougas received both the notice from Kalitta of its new vaccine mandate and the memo from Connie Kalitta indicating that Mr. Kalitta had made the personal decision to require vaccinations and to allow no exceptions.

217.   On October 19, 2021, Mr. Tougas was on a conference call—as part of a union meeting—where the local chairman and vice chairman were discussing the vaccine mandate with Laurie Stockton, the Vice President of Human Resources at Kalitta.  When Ms. Stockton was questioned about the safety and legality of the vaccine, she questioned the union leadership as to how so many employees still did not have the vaccine and stated that Kalitta wished that the exempt employees not getting the vaccine "would just leave and put us out of our misery."  At the time of this statement, Ms. Stockton was aware that many unvaccinated employees either

had religious beliefs or medical conditions that would preclude them from receiving a COVID-19 vaccine.

218.    Then Ms. Stockton specifically addressed the pilots who were exempt from the policy.  She stated that "even if [employees entitled to an accommodation under federal law] could come back, *we don't want them coming back*" and that she would soon be traveling to Miami to hire new employees to replace the ones about to be terminated.

219.    Mr. Tougas submitted a request for a reasonable accommodation on October 19, 2021, based on his allergies and the potential for the vaccines to trigger an auto-immune disease (a common occurrence in his family).  His auto-immune disability is a constant consideration for Mr. Tougas and he must be vigilant for any outside triggers that could incapacitate him at any time.

220.    Per Kalitta's direction, the medical request went to UNUM—an insurance company Kalitta used as the third-party evaluator for medical exemptions.

221.    UNUM's response to Kalitta stated that the company was able to accommodate Mr. Tougas by "mask, N-95."

222.    On October 31, 2021, Mr. Tougas also submitted a request for a religious accommodation.  As a faithful Christian, he is guided by God's Word—the Bible—and lives by the Scriptural command to regard your body as the temple of

the Holy Spirit.  Mr. Tougas prayed earnestly about the vaccine and felt that it would be defiling God's temple for him to take the vaccine.  God also provided Mr. Tougas with direction through faith and prayer that it would be a violation of his God-given rights to be coerced into taking the vaccine.  Moreover, Mr. Tougas objects to having anything to do with a vaccine tied to fetal stem cell lines as he is religiously opposed to abortion.

223.   On November 3, 2021, Mr. Tougas received the generic "Dear Team Member" letter for his medical exemption stating: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for twelve (12) months.  Thereafter, you may voluntarily resign or you will be terminated.**"  Mr. Tougas was never advised as to the status of his religious exemption request, despite multiple attempts to contact Kalitta on the matter.

224.   On November 3, 2021, Mr. Tougas emailed Ms. Stockton to point out the multiple studies showing both the effectiveness of natural immunity and that vaccinated individuals regularly spread COVID-19.   Indeed, Mr. Tougas had previously contracted COVID himself by flying with a *vaccinated pilot who swore he was not sick because he had the vaccine*.

225.   Ms. Stockton replied that same day: "Please send this to President Biden and request that he change his Executive Order 14042.  As it stands now, all of our government contracts have been amended and require us to abide by Executive Order 14042."   (Tellingly, President Biden did, in fact, change his Executive Order 14042 the very next day; Kalitta did not alter its policy.)

226.   Mr. Tougas responded to Ms. Stockton that the other companies subject to EO 14042 were not implementing the Order without accommodations (if they were implementing it at all), but she did not respond.

227.   Ms. Stockton later told pilots that "All Kalitta Air employees requesting religious exemptions received them. . . . There was no interactive process, it was granted.  I fail to see what the problem is when you got what you requested.  The accommodation is an unpaid leave."

228.   On December 3, 2021, Mr. Tougas received a company email threatening a $2500 fine if he did not return company property—iPad, iPhone, badge, KCM Badge (that allows jumpseating on other airlines), and credit card— within 10 days of starting unpaid leave.  This retaliatory action prevented him from keeping current with notifications and trainings from the company and FAA.

229.   Tellingly, Mr. Tougas is aware of at least one pilot who was allowed to keep his company property when placed on leave because he told the company he

was considering getting the vaccine and coming back.  Kalitta's action regarding company property was purely retaliatory and meant as a punishment to those who had engaged in protected activities and were unwilling to acquiesce to Kalitta's demands.

230.   Even after EO 14042 was delayed and then stayed in federal court, Kalitta determined it would continue to violate federal law "particularly [because] nearly all our employees have already complied."

231.   Mr. Tougas has confirmed that this same sentiment was reiterated to employees in March of 2022, shortly after Kalitta formally terminated employees who had been on unpaid leave for 90 days.  Kalitta's Vice President of Flight Operations—Bill Rhodes—told those in a pilot training class that bringing unvaccinated employees back "would not be fair to those who caved and got the shot."  Notably, on information and belief, many of the employees who caved to Kalitta's coercion were forced to surrender sincere religious beliefs or to disregard medical advice regarding a disability (or both).

232.   If Kalitta had engaged in an interactive process with Mr. Tougas, the company would have learned that vaccination was unnecessary for him because of his prior COVID-19 infection—an appropriate accommodation could have been a simple exemption from the job requirement.  As the CDC has confirmed, a prior

infection provides protection superior to a vaccine.  He also would have been open to regular testing that would have allowed him to continue working safely (and even more safely than Kalitta had previously operated throughout the pandemic) and even suggested that to the company.

233.   Alternatively, Kalitta could have allowed Mr. Tougas to continue working with the accommodation *recommended by the very company Kalitta hired to evaluate medical exemption requests*: wearing a mask while flying.

234.   Mr. Tougas would have also been willing to let Kalitta alter his flying schedule as needed to accommodate any foreign country restrictions.  Kalitta has a long history of working schedules around countries to which pilots or mechanics cannot travel.  For instance, there are as many as 50 employees in the company with no Chinese visa who must not be scheduled to travel to China.  Likewise, Kalitta constantly works around sending any employee to Canada with a prior felony on their record.  Because avoiding certain countries for trips is built in to the Kalitta system, it would have been no burden whatsoever for the company to accommodate exempt employees.

235.   Instead, Kalitta treated Mr. Tougas as though he had some sort of disability because of the lack of a vaccine and placed him on unpaid leave, causing tremendous stress and placing unwarranted strain on his marriage and his family.

He has also lost many nights of sleep and many friendships with co-workers with whom he was quite close.

### Charles Christian Galton

236.   Plaintiff Charles Christian Galton is a First Officer on the 747 for Kalitta from Buckley, Michigan.  *See* Exhibit I.

237.   Mr. Galton has flown around the world for Kalitta over the past 14 years without ever being forced to take a vaccination during his career.

238.   Due to a medical leave of absence, Mr. Galton was unaware of Kalitta's new COVID-19 vaccination policy until January of 2022.  At that time, he reached out to determine how he might obtain an exemption from the policy.

239.   Mr. Galton has a sincerely held religious belief against abortion and the presence of fetal stem cell lines in either the production or testing of the various COVID-19 vaccines prevents him from taking one of them.

240.   On February 8, 2022, Mr. Galton was informed that he was too late to apply for an exemption from the mandate but that it would not matter anyway.  Now he cannot return to Kalitta because the company is not providing any accommodations and he will be terminated immediately upon his return from medical leave.

241. Mr. Galton's prior COVID-19 infection, however, could easily satisfy Kalitta's COVID-19 vaccine requirement. There is no need for the company to treat Mr. Galton as though something would be wrong with him if he returned to work without having taken a vaccination.

**Travis Wayne Robertson**

242. Plaintiff Travis Wayne Robertson was a Flight Maintenance Engineer based out of the Kalitta's Michigan headquarters. He began working for Kalitta in 2019 after a 13-year career in the Army. *See* Exhibit J.

243. As an essential employee, Mr. Robertson flew vital missions for the government throughout the COVID-19 pandemic, contracting the virus while transporting essential goods and personnel around the world for Kalitta.

244. In October of 2021, Mr. Robertson received both the notice from Kalitta of its new vaccine mandate and the memo from Connie Kalitta indicating that Mr. Kalitta had made the personal decision to require vaccinations and to allow no exceptions.

245. As someone of deep faith, Mr. Robertson prayed and asked God about whether to take the COVID-19 vaccine or not. He felt that God specifically directed him to passages in the Bible indicating why he should not take the injection.

Through prayer and conversations with other believers, Mr. Robertson determined that he would follow God's guidance and refuse the vaccine.

246.   He did not, however, formally request an accommodation from Kalitta. Kalitta made clear from the outset of the policy that the only "accommodation" would be termination.  Mr. Robertson was fearful of Kalitta's retaliation against those who applied for an exemption and knew that it would not gain him anything to apply for the false accommodation anyway.

247.   Kalitta knew, however, that Mr. Robertson would not be taking the vaccine and needed an accommodation.  Indeed, by mid-November, Mr. Robertson was told by a friend who worked on the ground crew in Anchorage that Kalitta had already hired Mr. Robertson's replacement—almost a month ahead of the vaccination deadline.

248.   If Kalitta had offered anything besides a sham accommodation process, Mr. Robertson would have gladly engaged with the company and showed that several costless accommodations were available.  For example, vaccination was unnecessary in Mr. Robertson's case because of his prior COVID-19 infection. Alternatively, he would have worn a mask or even tested at his own expense to keep a job he loved.

249.   Instead, as Kalitta said before any exemption request was ever made, the only "accommodation" the company would countenance was unpaid leave followed by termination in 90 days.

250.   Mr. Robertson was terminated on December 8, 2021, when Kalitta made the incorrect determination that he was somehow deficient due to the lack of a COVID-19 vaccine and that his unvaccinated status prevented him from being able to perform his job safely (even though masks were previously considered safe by the company and even though the company accommodates unvaccinated jumpseaters in its aircraft).

### **Kevin McAllister**

251.   Plaintiff Kevin McAllister is a pilot on the 767 for Kalitta with over two decades of experience in the industry.  *See* Exhibit K.

252.   Like others at Kalitta, Mr. McAllister flew for the company throughout the pandemic.  Due to his aircraft, though, he flew almost exclusively domestic routes.

253.   Mr. McAllister also received the October 11, 2021 letter outlining Kalitta's new policy and planned effective denials of all accommodation requests.

254.   Mr. McAllister held out hope, however, that the company would change its mind and relent—at least for those entitled to an exemption from the mandate.

255.   He submitted a request for a reasonable accommodation on October 29, 2021 based on his sincerely held religious belief that the Bible commands him to honor his body as the temple of the Holy Spirit and to protect life.  He believed that it would be defiling God's temple to take the vaccine and also that it was wrong to use a vaccine tied to the destruction of human life through abortion.

256.   On November 2, 2021, Mr. McAllister received his generic "Dear Team Member" letter stating: "Your exemption is **APPROVED.  Your accommodation will be an unpaid leave of absence starting December 9, 2021 for ninety (90) days.  Thereafter, you may voluntarily resign or you will be terminated.**"

257.   While Kalitta acknowledged his sincerely held religious beliefs, the company was not interested in making any accommodations at Kalitta for such beliefs.  This would have been easy for Kalitta in Mr. McAllister's case, too, since he had already had COVID and since he virtually flew only domestic routes anyway. He would have even been willing to pay for his own testing so that he would have been even more safe than Kalitta employees flying throughout the pandemic without testing—including those vaccinated employees who could still contract and transmit COVID-19.

258.   Mr. McAllister continued to hold out hope throughout November of 2021 that Kalitta would rescind the mandate, especially in light of the President

delaying implementation of EO 14042 and signs that the Order might be stayed altogether. Instead, he saw Kalitta shift its rationale and entrench itself further on the vaccine mandate, revealing that the policy was not actually forced by EO 14042.

259. Kalitta was determined to rid itself of any unvaccinated employee, no matter the law or the facts, and assumed those lacking COVID-19 vaccinations had something wrong with them. There would be no reasonable accommodation.

260. As a result, Mr. McAllister was coerced into taking a COVID-19 vaccination on the last day possible in order to keep his job. Mr. McAllister also has a sincerely held religious belief—found in the Bible—that he must provide for his family and he could not provide for his wife and three children without his employment. Kalitta thus pitted Mr. McAllister's beliefs against one another and forced into a lose-lose scenario that Title VII was written to avoid.

261. The mental challenges for Mr. McAllister since that day have been devastating. Stressed beyond all reason, he capitulated to Kalitta's pressure tactics and is now forced to relive Kalitta's violation of his faith every day. In fact, he is still so ashamed of the fact that he took the vaccine that he will not admit to others outside the company that he did it.

## CLASS ALLEGATIONS

262.    Plaintiffs bring this class action under Federal Rules of Civil Procedure 23(a) and (b).

263.    Through this action, Plaintiffs seek to represent a class defined as: all Kalitta employees entitled to accommodations from Kalitta's vaccine mandate and whose accommodation requests were denied (*i.e.*, were "approved" by the company with the promised accommodation of unpaid leave followed by termination) or otherwise foreclosed by the company's discrimination.

264.    Plaintiffs will ultimately seek at least four subclasses when they move for class certification: (1) employees who sought either a religious or medical accommodation (or both) and who could have been reasonably accommodated by Kalitta but were placed on unpaid leave pending termination instead; (2) employees who abandoned their exemption from the mandate because of the company's unlawful actions that violated either their Title VII or ADA rights (or both); (3) employees terminated from the company who were entitled to a Title VII or ADA exemption but did not seek an exemption through Kalitta's process because the "accommodation" announced from the outset was inevitable termination and those employees were (rightly) afraid of retaliation by the company for seeking an accommodation; and (4) employees who were forced out of the company—either by

termination or involuntary retirement—because Kalitta regarded them as having a disability due to their lack of vaccination, even though they were not a danger to others.

265.   By instituting a comprehensive policy of treating all accommodation seekers precisely the same, Kalitta's actions are generally applicable to the entire class of Kalitta employees entitled to reasonable accommodations.  With its 100% denial rate of reasonable accommodations, combined with a complete failure to demonstrate any undue hardship (because it cannot), the company is liable for a pattern of discrimination.  Accordingly, the Court may grant relief to the entire affected class to remedy Kalitta's violation of federal civil rights laws.

266.   Additionally, the class is so numerous that joinder of all members is impractical.  While the exact class size is unknown to Plaintiffs at this time, it may exceed 350 employees.  The precise number and identification of the class members will be ascertainable from Kalitta's records during discovery.

267.   There are questions of law and fact common to all members of the class.  Those common questions include, but are not limited to, the following:

> a.      Did Kalitta engage in a pattern or practice of discrimination with respect to employees entitled to exemptions from the company's COVID-19 vaccine mandate when it preemptively denied all

requests for reasonable accommodations before employees had even made them?

b.   Did Kalitta comply with its obligations under federal law to engage in the interactive process when it preemptively denied any accommodations and then responded to exemption requests with the false accommodation of unpaid leave following no meaningful dialogue as to what solution could be reached?

c.   Did Kalitta violate employment discrimination law when it pretextually hid behind a federal Executive Order and falsely told employees that the Order required a no-accommodation policy in order to rid the company of employees with religious and medical exemptions from the vaccine mandate?

d.   Did Kalitta comply with its obligations under federal law to reasonably accommodate employees with religious and/or medical objections to the vaccine mandate when it continued to insist on summary denials of a reasonable accommodation without demonstrating *any* hardship, let alone undue hardship?

e.   Did Kalitta violate employment discrimination law when it pretextually assumed and then claimed that unvaccinated

employees would necessarily pose a greater threat to safety without evidence to support its claim?

f. Did Kalitta retaliate against employees who engaged in protected activity by engaging in punitive conduct against those who requested accommodations (such as threatening fines or contesting unemployment benefits) and by refusing to bring back employees even when it was clear the vaccine mandate was unnecessary and unsupported by the CDC and other health organizations?

268. Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested accommodations from Kalitta's vaccine mandate and Kalitta denied those requests before they were even made.

269. For the same reason, Plaintiffs will fairly and adequately protect the interests of the class because their interests in resolving the matter are the same as those of the class and they have no conflicts of interest with the class.

270. Because of Kalitta's illegal policy denying all reasonable accommodations to every exempt employee, the questions of law or fact common to the members of the class predominate over any questions affecting only individual

members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.  Joinder of all members is impracticable.

271.   As explained above, Kalitta has taken at least one relevant act that affects all members of the class.  In addition, Kalitta's act or acts have been felt by class members in this State and across the country.

## COUNT I
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—failure to provide reasonable accommodation

### On behalf of Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, Galton, Robertson, and McAllister, and others similarly situated

272.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

273.   Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, Galton, Robertson, and McAllister hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

274.   Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, and McAllister informed Kalitta of those beliefs and requested religious accommodations from the vaccine mandate.  Plaintiff Galton attempted to inform Kalitta of his sincerely held religious beliefs but was told he was too late because he was on leave when the accommodation forms were to be submitted.

275.   Kalitta refused to engage in the interactive process with Plaintiffs regarding their religious accommodation requests, preemptively denying each of their requests with the promised false "accommodation" of unpaid leave to be followed by termination even though Kalitta conceded that the beliefs were sincere.

276.   Irrespective of the interactive process, Kalitta failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.  Termination (or unpaid leave for 90 days pending termination) is an adverse employment action.

277.   Plaintiff Robertson was effectively prevented from formally requesting an accommodation due to Kalitta's coercive actions and promise of no reasonable accommodation.  Though entitled to an exemption from the mandate, the threat of retaliation from the company prevented him from exercising his rights.

278.   Moreover, Kalitta limited and segregated employees even prior to any request for an accommodation based on their religious beliefs.  Plaintiffs thus suffered a deprivation of employment opportunities and had their employee status adversely affected by Kalitta's actions.

279.  Kalitta thereby discriminated against Plaintiffs because of their religious beliefs.

280. Kalitta's failure to provide religious accommodations harmed and will continue to harm Plaintiffs. Kalitta went so far as to violate Mr. McAllister's faith by illegally coercing him to take the vaccine in order to provide for his family.

281. By failing to engage in the interactive process or offer any reasonable accommodation, Kalitta's discriminatory actions were intentional and/or reckless and in violation of Title VII.

## COUNT II
## Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
## Religious discrimination—retaliation

## On behalf of Plaintiffs Odell, Pingot, Kotula, Verlander, Webber, and Hudnutt, and others similarly situated

282. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

283. Plaintiffs Odell, Pingot, Kotula, Verlander, Webber, and Hudnutt engaged in protected activity when they requested religious accommodations from Kalitta's vaccine mandate.

284. Kalitta responded by denying every request for accommodation. Though its justification changed, Kalitta followed through with its plan to terminate every employee seeking a religious accommodation.

285. Kalitta's response to Plaintiffs' protected activity is an adverse employment action intended to force employees to forego their religious beliefs and receive the COVID-19 vaccine. Though Kalitta accepted the sincere religious

beliefs of each Plaintiff, that had no bearing on Kalitta's approach to dealing with the employees.

286.   In addition to placing employees requesting religious accommodations on unpaid leave, Kalitta retaliated against Plaintiffs by threatening fines if company property was not returned immediately—property that Plaintiffs were entitled to keep during a leave of absence.

287.   Additionally, Kalitta treated Plaintiffs worse precisely *because* they sought a religious exemption.   Kalitta did this by: (1) contesting unemployment insurance claims for any employee who requested a religious exemption; and (2) formally terminating those requesting religious exemptions after three months instead of the twelve months given to those with medical exemptions.

288.   Kalitta then continued to retaliate by not reinstating those with religious exemptions even after it became apparent to Kalitta that the COVID-19 vaccine mandate was not needed and could not be supported by scientific evidence.

289.   Plaintiffs' religious beliefs and protected activity were the causes of Kalitta's adverse employment actions.

290.   By retaliating against Plaintiffs for engaging in protected activity, Kalitta has violated Title VII.   This violation has harmed and continues to harm Plaintiffs.

**COUNT III**
**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**Disability discrimination—failure to accommodate ADA disability**

**On behalf of Plaintiffs Jones and Tougas, and others similarly situated**

291.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

292.   Plaintiffs Jones and Tougas informed Kalitta of their disabilities.

293.   Plaintiffs Jones and Tougas requested reasonable medical accommodations from Kalitta's vaccine mandate for their disabilities.

294.   Kalitta refused to engage in the interactive process with Plaintiffs regarding their medical accommodation requests.  The company merely accepted the exemption request through its third-party evaluation company UNUM and then denied all reasonable accommodations.

295.   Kalitta unilaterally overrode the determination of UNUM that Kalitta was able to provide Plaintiffs with a reasonable accommodation.

296.   Kalitta did not prove—and, especially given their prior COVID-19 infections, cannot prove—that Plaintiffs posed any increased risk of transmitting COVID-19 than their fellow employees.

297.   Kalitta violated the ADA when it denied Plaintiffs' accommodation requests and offered them termination (or the functional equivalent of forced unpaid leave) instead.

298.   Kalitta thereby discriminated against Plaintiffs because of their disabilities.

299.   Kalitta's failure to provide medical accommodations has harmed and continues to harm Plaintiffs.

300.   By failing to engage in the interactive process or offer any reasonable accommodation, Kalitta's discriminatory actions were intentional and/or reckless, and in violation of the ADA.

## COUNT IV
### Violation of the ADA, 42 U.S.C. § 12101, *et seq*.
### Disability discrimination—retaliation

**On behalf of Plaintiffs Jones and Tougas, and others similarly situated**

301.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

302.   Plaintiffs Jones and Tougas engaged in protected activity when they requested medical accommodations from Kalitta's vaccine mandate.

303.   Kalitta responded by taking an adverse employment action against each of them when it announced that it would terminate their employment for not receiving the vaccine (or force them into unpaid leave, the functional equivalent of termination).

304.  Kalitta's response to Plaintiffs' protected activity is an adverse employment action intended to force employees to forego their medical reasons for not receiving the COVID-19 vaccine.

305.  In addition to placing Plaintiffs on unpaid leave, Kalitta retaliated against them by threatening fines if company property was not returned immediately—property that Plaintiffs were entitled to keep during a leave of absence.

306.  Kalitta further retaliated against Plaintiffs by not bringing them back from unpaid leave when it became apparent to Kalitta that its vaccine mandate was unnecessary and its lack of accommodations unjustifiable.

307.  Plaintiffs' medical disability and protected activity were the causes of Kalitta's adverse employment action.

308.  By retaliating against Plaintiffs for engaging in protected activity, Kalitta has violated the ADA.

**COUNT V**
**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**Disability discrimination—discrimination based on perceived disability**

**On behalf of Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, Galton, Robertson, and McAllister, and others similarly situated**

309.  Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

95

310.   Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, Galton, and McAllister informed Kalitta that they were unable to receive a COVID-19 vaccination.

311.   Plaintiffs Odell, Pingot, Kotula, Jones, Verlander, Webber, Hudnutt, Tougas, and McAllister requested reasonable accommodations from Kalitta's vaccine mandate.

312.   Plaintiff Galton informed Kalitta of his need for an accommodation upon return from leave but has been told he will have to be vaccinated when he returns or be terminated immediately.

313.   Plaintiff Robertson was known by Kalitta to be one of its employees not taking the COVID-19 vaccine (and indeed the company hired his replacement a month prior to the deadline for receiving the vaccine).

314.   Kalitta regarded Plaintiffs as disabled, perceiving them as though they were perpetually infected with COVID-19.

315.   Kalitta did not prove—and, especially given their prior COVID-19 infections, cannot prove—that Plaintiffs posed any increased risk of transmitting COVID-19 than their fellow employees.

316.    Kalitta nevertheless treated Plaintiffs as though they were disabled (*i.e.*, that they could not perform their job safely) because they had not received a COVID-19 vaccination.

317.    Kalitta thereby discriminated against Plaintiffs because of an imagined disability that was neither transitory nor minor as Kalitta believed it impacted the major life function of working.

318.    By limiting, segregating, and classifying employees in a manner that adversely affected their employment opportunities based on an imagined disability, Kalitta engaged in disability-based discrimination in violation of the ADA, thereby harming Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

a.    Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b).

b.    Declare that Kalitta has violated Title VII and the ADA by failing to engage in the interactive process in response to requests for accommodations to its COVID-19 vaccine mandate and, instead, preemptively denying all such requests based on pretextual reasons.

97

c.      Declare that Kalitta has violated Title VII and the ADA by discriminating against its employees by failing to provide reasonable accommodations to its COVID-19 vaccine mandate.

d.      Declare that Kalitta has violated Title VII and the ADA by retaliating against employees who engaged in protected activity.

e.      Declare that Kalitta has violated the ADA by treating unvaccinated employees as though they were medically deficient because they had not taken a COVID-19 vaccination.

f.      Award Plaintiffs, and those similarly situated, damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

g.      Award Plaintiffs reasonable attorneys' fees and costs.

h.      Grant any other relief that the Court deems just, proper, and equitable.

i.      Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

September 27, 2022

Respectfully submitted,

John C. Sullivan*
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com


*/s/ Allison R. Lucas*
Allison R. Lucas
    MI State Bar No. P73331
Aaron Siri*
Elizabeth A. Brehm*
Walker Moller*
SIRI | GLIMSTAD
220 West Congress Street, 2nd Floor
Detroit, MI  48226
Telephone: (313) 251-9161
Facsimile: (646) 417-5967
alucas@sirillp.com
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

* Motions for admission forthcoming

*Counsel for Plaintiffs and the
Proposed Class*