## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

ROBERT W. ODELL, JR.,
*et al.*,

        *Plaintiffs,*

                          CASE NO. 1:22-cv-12290

*v.*

                          District Judge Thomas L. Ludington

KALITTA AIR, LLC, and      Magistrate Judge Patricia T. Morris
CONRAD KALITTA
*In Only His*
*Official Capacity*,

        *Defendant.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 19) AND PLAINTIFFS' MOTION TO DEFER CONSIDERATION (ECF No. 38)

## I.   RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendants'

motion for summary judgment (ECF No. 19) **IN PART** and **DENY** Plaintiffs'

motion to conduct additional discovery (ECF No. 38). If adopted, the Court would

(1) convert Defendants' motion to dismiss to a motion for summary judgment;[1] (2)

enter summary judgment against Plaintiffs Webber, Hudnutt, Tougas, Galton, and

McAllister on Counts I, III, and V; (3) deny summary judgment against Plaintiffs

_____

[1] (*See* ECF No. 34).

Webber, Hudnutt, and Tougas on Counts II and IV; and (4) dismiss Plaintiffs Galton and McAllister from this action.

## II.   **REPORT**

### A.   **Introduction**

This case is about a group of airline employees who refused to get vaccinated against COVID-19 after their employer imposed a company-wide vaccine mandate. Each employee requested either a medical or religious accommodation allowing them to work unvaccinated, and after their employer denied their requests, they filed this putative class action alleging retaliation and unlawful failure to accommodate under Title VII and the ADA.

But the merits of those claims are not at issue today.  This motion concerns a narrower, threshold issue: whether the Railway Labor Act ("RLA") precludes some of the plaintiffs from even litigating their claims in this Court.  The RLA prohibits railway and airline employees from bringing disputes over rights and duties created by collective bargaining agreements ("CBAs") directly to federal or state court. Instead, the RLA establishes a mandatory arbitration scheme for these disagreements, known as "minor disputes."

Kalitta Air argues that five of the Plaintiffs here assert claims that constitute minor disputes and therefore must be dismissed so that they may be litigated (if at all) through the RLA's arbitral scheme.  That is so, Kalitta explains, not because the

2

five plaintiffs subject to a CBA seek to enforce rights created by that agreement, but because essential elements of their claims would turn on how the Court interprets certain provisions in the CBA.  Indeed, the Sixth Circuit has consistently explained that minor disputes are not only those that concern rights created by the CBA, but also those that cannot be decided without interpreting the agreement—even if the dispute is brought under state law or a federal statute.  At issue, then, is whether the Court can resolve these Plaintiffs' claims without interpreting the CBA.

### B.    Background

Kalitta Air is a cargo airline headquartered in Ypsilanti, Michigan.  (ECF No. 1, PageID.21, 64, ¶¶ 44–45, 186).   In October 2021, Kalitta required all of its employees to receive a COVID-19 vaccine by December 8.  (*Id.* at PageID.25, 26, ¶¶ 57, 59).  Following "tremendous internal resistance" from "half of its employees," Kalitta explained that its vaccine mandate was required by an Executive Order which "required all federal contractors (and their sub-contractors) to mandate COVID-19 vaccinations for their workforces."  (*Id.* at PageID.25, ¶¶ 57–59).  Believing that the Executive Order did not allow for religious or medical exemptions, the company warned its employees that anyone who requested an exemption from the mandate would "be placed on an unpaid leave . . . ."  (*Id.* at PageID.26, ¶¶ 61–62) (emphasis removed).

A few days later, Conrad Kalitta, the "sole owner" and CEO of Kalitta Air, sent a letter to every employee in which he explained that after consulting "with legal firms, White House officials, and lobbyists from Washington, DC," he learned that Kalitta Air could lose "federal contracts if it did not reach a 100% employee vaccination rate . . . ." (*Id.* at PageID.21, 26–27, ¶¶ 45, 57, 63; *see also* ECF No. 26-4, PageID.357). For that reason, Conrad Kalitta explained that "he was forced to make the decision to [require] absolute compliance." (ECF No. 1, PageID.26–27, ¶¶ 57, 63).

As promised, Kalitta denied all requests for a medical or religious exemptions to the vaccine mandate. Over a month before Kalitta's internal deadline for vaccination, the company sent every employee who requested a medical or religious exemption received a letter that purported to "approve[]" their accommodation. (ECF Nos. 26-5 to 26-6). However, the letters went on to explain that these employees would be required to take "an unpaid leave of absence" beginning the day after the deadline for vaccination. (*Id.*) Following their leave of absence, the employees would be terminated unless they "voluntarily" resigned. (*Id.*) Kalitta also stated that it would begin seeking replacements for these employees two weeks before their forthcoming leave of absence, and any employee who became "fully vaccinated for COVID-19" could "apply for an open position" but would not "be guaranteed employment." (*Id.*) The letters did not clarify whether these employees

could avoid their unpaid leave altogether by becoming fully vaccinated before the December 8 vaccination deadline. (*Id.*)

A group of these employees filed this putative class action against Kalitta Air, alleging that the vaccine mandate violated the ADA and Title VII of the Civil Rights Act of 1964. (ECF No. 1).[2] The Plaintiffs claim that these Acts required Kalitta to accommodate their disabilities and religious beliefs by allowing them to work unvaccinated, and that Kalitta could have mitigated any safety risks by requiring its unvaccinated employees to wear masks, take regular COVID-19 tests at their own expense, or have obtained natural immunity from a prior COVID-19 infection. (ECF No. 1, PageID.10–12, ¶¶ 19–21). In addition, several of the Plaintiffs alleged that Kalitta retaliated against them for requesting accommodations by "contesting" their "unemployment payments" and threatening to fine employees who did not "immediately" return company property. (*Id.* at PageID.13–14, ¶¶ 26–27).

Kalitta moved to dismiss their complaint in part under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. (ECF No. 19). Kalitta argued that the Plaintiffs who worked for company as pilots (i.e., Kevin Webber, Isaac Hudnutt, Christian Tougas, Charles Christian Galton, and Kevin McAllister) all asserted claims that implicated a collective bargaining agreement ("CBA")

---

[2] Plaintiffs' complaint also names Conrad Kalitta, but the Court has dismissed all individual capacity claims against him. (ECF No. 36).

between Kalitta and its pilots. (*Id.*)  Thus, according to Kalitta, the RLA required

the Pilots to arbitrate their claims following the procedures set forth in the Act. (*Id.*)

The Pilots concede that they did not follow these procedures, but they counter that

they need not have done so, as their Title VII and ADA claims do not implicate the

CBA.  (ECF No. 37-1, PageID.387–92).

The CBA touches on all aspects of the Pilots' relationship with Kalitta.  (*See*

ECF No. 19-2).  In relevant part, it excuses Kalitta from assigning a pilot on flights

if he or she "lacks the necessary visas, vaccines[,] and permits to perform such

work." (ECF No. 19, PageID.263 (citing ECF No. 19-2, PageID.295).  The CBA

also details a "seniority-based bidding system" that Kalitta uses to create its pilots'

flight schedules. (*Id.* at PageID.262–63).  Under the bidding system, "pilots submit

preferences for" scheduling options such as "dates and length of travel, routes,

layovers[,] and aircraft type." (*Id.*; *see also* ECF No. 19-2, PageID.280–81, 297–

301).  The pilots with greater seniority are given priority when submitting bids. (*See*

*id.*)  According to Kalitta, accommodating the Pilots could frustrate its bidding

system as many countries do not allow unvaccinated pilots to enter, and altering the

flight schedules of unvaccinated pilots would force the company to deviate from its

normal bidding process. (ECF No. 19, PageID.263–65).

After the Parties completed briefing, the Undersigned notified them that she

intended to construe Kalitta's motion to dismiss as a motion for summary judgment

because it raised a nonjurisdictional issue and relied on materials outside of the complaint.  (ECF No. 34).  Both sides were allowed to supplement their briefing or move for additional time to conduct discovery relevant to the motion.  (*Id.* at PageID.483).  Kalitta chose to rest on its initial briefing, but the Pilots moved the Court to defer consideration on Kalitta's motion so the parties could conduct additional discovery.  (ECF Nos. 37 –38).  Kalitta opposes the Pilots' motion and asks the Court to immediately rule on its motion for summary judgment.  (ECF No. 41).

### C.   Standard of Review

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that would affect "the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ."  *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56

motion by merely alleging that a genuine factual dispute exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact could find in its favor."  *Anderson*, 477 U.S. at 248.

### D.    Analysis

#### 1.    Railway Labor Act

Congress passed the RLA to stabilize "labor-management relations" in the railroad and airline industries through a "comprehensive" dispute resolution "framework."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  Under this framework, employers and employees must resolve disputes related to CBA under a mandatory arbitral scheme.  *Id.* (citing 45 U.S.C. §151a).

The Act divides conflicts over CBAs into two categories.  *Id.*  In the first category are "major" disputes that relate to "the formation of [CBAs] or efforts to secure them."  *Id.* (internal quotation marks omitted) (quoting *Consol. Rail Corp. v. Ry. Labor Executives' Assn.*, 491 U.S. 299, 302 (1989)).  Disputes regarding the creation of rules regarding "rates of pay" and "working conditions" fall under this category.  45 U.S.C. § 151a.  The second category of disputes, known as "minor" disputes, grow "out of the interpretation or application" of existing CBAs.  *Id.*  These concern "controversies over the meaning of an existing [CBA] in a particular" situation.  *Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957).  In essence,

"major disputes seek to create contractual rights" and "minor disputes" seek to "enforce" existing contractual rights.   *Consol. Rail Corp.*, 491 U.S. at 302; *see also Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 785 (6th Cir. 2012).

Aggrieved parties cannot bring minor disputes directly to a federal or state court.   *Emswiler*, 691 F.3d at 785 (citing 45 U.S.C. § 152–53).   Instead, minor disputes must be arbitrated before the National Railroad Adjustment Board, over whose decisions the district courts have limited review.   *Id.*; *see also Airline Prof'ls Ass'n of the Int'l Bhd. Of Teamsters, Local Union No. 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001).   Kalitta argues that the Pilots' Title VII and ADA claims are minor disputes and therefore must be dismissed as they have not been arbitrated before the Board.

Of course, minor disputes concern the enforcement of rights "grounded in" a CBA, and the Pilots seek to enforce rights that are created by federal statutes.   *Norris*, 512 U.S. at 256.   As a general rule, the RLA does not prohibit employees from bringing "independent" causes of action directly to federal court, even if their CBA creates parallel rights that turn on the same facts or conflict.   *Id.* at 256–63; *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408–10 (1988); *see, e.g.*, *Atchison, T. & S.F.R. Co. v. Buell*, 480 U.S. 557, 564–66 (1987); .

Yet not all causes of action created by federal or state law are truly independent of a CBA.   A state or federal claim that "depend[s] on the interpretation

of the CBA" is a minor dispute, even if the cause of action itself is not created by the CBA. *Andrews v. Louisville & Nashville R. Co.*, 406 U.S. 320, 324 (1972). For instance, a state-law wrongful termination claim stemming from a contractual right created by a CBA constitutes a minor dispute. *Id.* Similarly, the Sixth Circuit has held that a state-law discrimination claim constituted a minor dispute because it boiled down to a dispute over whether an employer had correctly interpreted and applied a provision of its CBA. *Emswiler*, 691 F.3d at 792–93. At a minimum, therefore, a plaintiff cannot circumvent the RLA's mandatory arbitration process by simply repackaging his or her minor dispute under some other cause of action found under federal or state law. *See Norris*, 512 U.S. at 257–58, 261.

The Sixth Circuit has also explained that whenever an "essential element" of a claim turns on the "interpretation" of a CBA, the claim is a minor dispute and therefore subject to arbitration under the RLA. *See DeCoe v. General Motors Corp.*, 32 F.3d 212, 216, 220 (6th Cir. 1994); *see also Emswiler*, 691 F.3d at 792. And that is true even if the employee's cause of action does not merely serve as a vehicle to enforce a right created by the CBA. *See, e.g., DeCoe*, 32 F.3d at 217–20 (holding that an employee's claims for intentional infliction of emotional distress and defamation were minor disputes because elements of these claims, which limited the

employee's right to relief, turned on provisions of a CBA).[3]  The employee's claim is independent of the CBA only if he or she "can prove *all* of the elements of" the claim without reference to the CBA.  *DeCoe*, 32 F.3d at 216 (emphasis added).

Importantly, however, a cause of action does not become a minor dispute merely because a CBA provision may be a "relevant but nondispositive factor" in deciding that claim—the interpretation of the CBA must be able to "conclusively resolve" an essential element of the claim.  *Norris*, 512 U.S. at 257–63; *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 668 (7th Cir. 2001).  "Moreover, neither a tangential relationship to the CBA, nor the defendant's assertion of the contract as an affirmative defense will turn an otherwise independent claim into a claim dependent on the labor contract."  *DeCoe*, 32 F.3d at 216; *see also Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 355 (6th Cir. 2020).

Because the RLA precludes any claim that depends on interpretation of the CBA, it is not necessary for a court to find that a CBA provision actually disposes of a cause of action.  (*Contra* ECF No. 27-1, PageID.384–87).  If a CBA provision could "arguably" dispose of an essential element of a claim, then that claim concerns

---

[3] At issue in *DeCoe* was whether § 301 of the Labor Management Relations Act ("LMRA") preempted a state law claim. *Id.* at 215–16.  Under § 301, all minor disputes in any industry may be brought in federal court and must be resolved by reference to federal law.  *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150*, 3 F.4th 866, 872–73 (6th Cir. 2021).  The standards for determining whether a claim constitutes a minor dispute is the same under both the RLA and the LMRA.  *Norris*, 512 U.S. at 263; *see also Emswiler*, 691 F.3d at 792 (citing *DeCoe*, 32 F.3d at 216).

a minor dispute.  *Consol. Rail Corp.*, 491 U.S. at 307; *Emswiler*, 691 F.3d at 793; *see* Norris, 512 U.S. at 265.  It is up to the National Railroad Adjustment Board—not the district court—to interpret that provision and decide whether it does resolve the employee's claim.  *See, e.g.*, *Emswiler*, 691 F.3d at 792–93 (holding that a state-law discrimination claim constituted a minor dispute without ever interpreting the CBA to determine whether it disposed of the claim).

In short, a minor dispute exists where (1) "proof of" a claim "would require interpretation of the CBA" or (2) "the right claimed by" the employee "is created by the" CBA.  *Id.* at 792.  So because the Pilots' claims stem from Title VII and the ADA, rather than the CBA, their claims are only precluded by the RLA if they require interpretation of the CBA.  For the following reasons, I suggest that the RLA precludes the Pilots' claims alleging failure to accommodate under Title VII and the ADA, but not their claims alleging retaliation.

### a.    ADA and Title VII Accommodation

Other courts have recognized that Title VII and ADA discrimination claims may sometimes require interpretation of a CBA.  Title I of the ADA and Title VII of the Civil Rights Act of 1964 require employers to accommodate employees' disabilities and religious beliefs, respectively.  42 U.S.C. §§ 2000e(j), 2000e-2(a), 12112(a), (b)(5)(A).  But these duties to accommodate are not limitless.  The ADA and Title VII only require employers to make "reasonable" accommodations up to

the point that these accommodations impose an "undue hardship" on their business. *Id.* Courts have found that it is unduly burdensome for an employer to accommodate a disability or religious belief by "abandoning [a] seniority system established by a collective bargaining agreement" and thereby "breaching the contractual rights of its employees." *Brown*, 254 F.3d at 660–61 (citing *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996)); *Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 680–83 (2018) (first citing *Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 517 (6th Cir. 2002); and then citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). Thus, when an employee insists on an accommodation that implicates his or her coworker's seniority rights under a CBA, it becomes necessary to interpret the CBA to determine whether the accommodation would impose an undue hardship by forcing the employer to violate the CBA. *Id.*[4]

The Pilots propose that Kalitta should have accommodated their disabilities and religious beliefs by allowing them to work unvaccinated on the condition that

---

[4] In *Hardison*, the Supreme Court held that any accommodation imposing more than a de minimis cost on the employer constitutes an undue burden. 432 U.S. at 84. The Supreme Court is expected to reevaluate this standard when it issues its opinion in *Groff v. DeJoy*, 35 F.4th 162 (3d Cir. 2022), *cert. granted* 143 S. Ct. 646 (2023), later this year. But even if the Court jettisons *Hardison*'s de minimis test in favor of a more robust standard, that likely would not affect *Hardison*'s core holding that accommodations frustrating collectively bargained seniority rights of other employees constitute an undue burden. Indeed, even the dissenting opinion in *Hardison*, which heavily criticized the majority's de minimis test, "stop[ped] short of challenging the fundamental proposition that Title VII does not require an employer . . . to deprive senior employees of their seniority rights" to "accommodate a junior employee's religious practices." 432 U.S. at 83, n.14, *see also id.* at 93–96 (Marshall, J., dissenting).

13

they (1) receive regular COVID-19 testing at their own expense, (2) wear masks, (3) have obtained natural immunity, or (4) not be scheduled for flights to countries that require vaccination. (ECF No. 1, PageID.10–12, ¶¶ 19–21; *see also id.* at PageID.72, 78, ¶¶ 212, 234).  The Pilots claim that they would have found any or all of these conditions to be acceptable, and they allege that any combination of these conditions would have adequately protected their crewmembers.  (*Id.*)

Although Kalitta argues that each proposed accommodation would require interpretation of the CBA, it neglects to explain how the first three of these accommodations (concerning testing, masks, and natural immunity) would violate the seniority rights of its employees.  (ECF No. 19).  True, Kalitta does argue that any accommodation would conflict with a CBA provision that allows it to decline "to assign a Crewmember to a trip if the Crewmember lacks the necessary . . . vaccines," by jettisoning its discretion to deny flights to unvaccinated pilots.  (ECF No. 19, PageID.263 (citing ECF No. 19-2, PageID.295)).  But Kalitta cites no authority for the proposition that all accommodations that conflict with *any* CBA provision are undue burdens.  The cases Kalitta cites—*Hardison* and *Stanley*—dealt specifically with seniority provisions contained in CBAs, and their rationale rested on the unique features of seniority rights rather than those of collectively bargained rights in general.  *Hardison*, 432 U.S. at 79–83; *Stanley* 808 F. App'x at 356.  Indeed, *Hardison* cautioned that parties generally cannot contract away their statutory

14

obligations through CBAs. *See* 432 U.S. at 79. Yet Kalitta does not even attempt to explain why deviating from the CBA provision here would constitute an undue hardship under *Hardison*. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1989) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Nor could it. Even if an accommodation allowing the Pilots to fly unvaccinated would impose an undue burden, that burden would not stem from the conflict with the CBA, and therefore it would not be necessary to interpret the CBA to determine whether Title VII or the ADA require the accommodation. When a potential accommodation could interfere with a seniority scheme, it is necessary to interpret the CBA because the agreement itself both creates and defines the scope of the employees' seniority rights. *See Stanley*, 356 F. Supp. 3d at 689–91. *See generally Norris*, 512 U.S. at 261–62; *Norwood*, 318 U.S. at 6–7. Thus, it is the violation of the CBA itself that causes the undue burden. *Brown*, 254 F.3d at 665–66. In contrast, the burden imposed here by allowing unvaccinated pilots to fly is independent of the CBA. Indeed, the burden imposed on Kalitta comes from its employees' risk of infection, not the deprivation of an interest created by the CBA. Surely, Kalitta would not consider the accommodation any less burdensome if the CBA did not explicitly mention its right to deny work to unvaccinated pilots. While the CBA affirms Kalitta's interest in preventing communicable disease, it does not

15

create that interest, and the Court need not interpret the CBA merely because it creates duties or interests parallel to those existing outside of the agreement.  *See Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 921 (9th Cir. 2018); *cf. Atchison*, 480 U.S. at 564–65; *McCall v. Chesapeake & Ohio Ry. Corp.*, 844 F.2d 294, 300 (6th Cir. 1988) (holding that an employee's state-law discrimination claims were not minor disputes under the RLA even though the CBA and state statute created identical rights).  Thus, insofar as the Pilots request an accommodation allowing them to fly unvaccinated on the condition that they wear masks, take regular tests, or obtain natural immunity, Kalitta fails to show how these accommodations require the Court to interpret the CBA.

Kalitta does, however, correctly argue that the Pilots' final proposed accommodation, allowing them to fly unvaccinated by not scheduling them on flights to countries that require COVID-19 vaccinations, conflicts with the seniority rights of other employees.  Kalitta explains that its Pilots' flight schedules are based on a "seniority-based bidding system" created by the CBA.  (ECF No. 19, PageID.262–63).  Under this system, "pilots submit preferences for" scheduling options such as "dates and length of travel, routes, layovers[,] and aircraft type." (*Id.*; *see also* ECF No. 19-2, PageID.280–81, 297–301).  Thus, any change to the Pilot-Plaintiffs' schedules could displace the bids of other Kalitta pilots and impinge their seniority rights.  That would constitute an undue burden on Kalitta.  See

16

*Hardison*, 432 U.S. at 79–83; *Brown*, 254 F.3d at 660–61.  Accordingly, evaluating whether the accommodation imposes an undue burden would necessarily entail interpreting the CBA to determine whether the scheduling adjustments would impact the collectively bargained seniority rights of Kalitta's other pilots.  *Cf. Brown*, 254 F.3d at 660–61; *Stanley*, 356 F. Supp. 3d at 689–92; *see also Stanley*, 808 F. App'x at 356 (explaining that "undue hardship is not a defense raised to excuse a Title VII violation").

The Pilots counter that in practice, the CBA does not operate how Kalitta describes it.  They explain that the CBA "allows for administrative flexibility of schedules" by permitting "any pilot to be moved from one schedule to another at any time without violating the agreement."  (ECF No. 27-7, PageID.412).  For example, pilots with prior felony convictions cannot enter Canada, and other airlines address this issue by not scheduling convicted felons on flights to Canada notwithstanding any impact that may have on the bids of senior employees.  (*Id.* at PageID.413).

To be sure, this information is relevant to determining whether Kalitta would violate the CBA by accommodating the unvaccinated pilots.  "[A] CBA, unlike a private contract, is a "'generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . .'"  *Consol. Rail Corp.*, 491 U.S. at 311–12.  So the CBA's terms include not only those memorialized in the text of the agreement, but also those created by "the parties' practice, usage, and custom . . . ."

17

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pacific R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2017).   However, whether the Pilots' proposed accommodation actually violates the CBA is beside the point.  What matters is whether the Court can decide their claims without "interpreting" the CBA.  *Emswiler*, 691 F.3d at 792–93. That their claims cannot be decided without comparing the CBA's text to industry practice only bolsters Kalitta's argument that the Court cannot decide the Pilot's discrimination claims without interpreting the CBA.  *Cf. VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 271 (N.D. Ill. 2018).

Moreover, the Pilots' willingness to condition their accommodation on other requirements that do not implicate the CBA (such as masking or testing) makes it no less necessary to determine whether the accommodation would impact the seniority bidding rights of other pilots.  Even where a proposed accommodation would pose an undue burden if it violated a CBA, it is not necessary for the Court to consult the CBA if the employer could consider alternative accommodations that do not implicate the CBA.  In *Paul v. Kaiser*, for example, a CT technologist sued her employer for disability-discrimination under Ohio law for refusing to accommodate her back injury by providing her with assistance when she had to position patients for X-rays.  701 F.3d 514, 517 (6th Cir. 2012).  The employer removed the action to federal court, arguing that her request constituted a minor dispute which gave the district court jurisdiction under § 301 of the LMRA.  *Id.* at 518.  The employer

18

explained that accommodating the employee's injury would require it to adjust other employees' schedules, which would implicate provisions of the CBA. *Id.* at 522. The Sixth Circuit conceded that any scheduling change would implicate the CBA; however, the Court reasoned that the plaintiff never "requested a schedule change" and her request for assistance did not necessarily require the employer to shift the schedules of other employees. *Id.* at 522–23. Indeed, the employee had never "encountered a situation when needed help was not available" up to that point, and hospital policy already required "all employees to obtain assistance before moving patients." *Id.* Because the employer had "other options" to accommodate the employee, the employee's action did not constitute a minor dispute, even though one possible course of action may have implicated the CBA. *Id.*

Here, however, there are no "other options" that Kalitta can consider in place of scheduling unvaccinated pilots so that they do not fly to countries requiring COVID-19 vaccinations. While Kalitta could consider accommodations that involve masking, natural immunity, or regular testing, none of these options are alternatives to adjusting the schedules of unvaccinated pilots. Indeed, Kalitta cannot realistically be expected to send unvaccinated pilots to countries they are not allowed to enter. And that is no less true even if the Pilots take other precautionary measures in lieu of vaccination. Accordingly, I suggest that the Pilots' claims regarding Kalitta's failure to accommodate their religious beliefs and disabilities (Counts I, III,

and V) are minor disputes as they cannot be resolved without interpreting the CBA, and the RLA therefore mandates arbitration.

That nearly resolves this issue, but there is one final nuance that merits discussion. The Pilots focus their briefing on whether their discrimination claims are minor disputes under the RLA. (ECF No. 27-1). But they ignore that their claims derive from two other federal statutes passed by Congress decades after the RLA. The Pilots do not argue that claims brought under Title VII or the ADA are never precluded by the RLA, even if those claims might otherwise constitute minor disputes. *See, e.g.*, *Brown*, 254 F.3d at 661–64. In other words, the Pilots' Counsel passed up an opportunity to argue that Title VII and the ADA partially repealed the RLA by implication.

Indeed, their briefing overlooks a subtle (but potentially dispositive) distinction between state-law claims, that can be "preempted" by the RLA, and federal claims, that can be "precluded" by the RLA. *See Stanley*, 356 F. Supp. 3d at 683 n.2. Both preemption and preclusion turn on Congressional intent. *Felt v. Atchison, Topeka, & Santa Fe Ry. Co.*, 60 F.3d 1416, 1419 (9th Cir. 1995). However, state law claims are subject to the Supremacy Clause of the U.S. Constitution, so finding that the state law claims constitute a minor dispute subject to mandatory arbitration is generally sufficient evidence that Congress intended to supplant the conflicting state law. *Coker v. Transworld Airlines*, 165 F.3d 579, 583–

20

84 (7th Cir. 1999); *see also Saridakis v. United Airlines*, 166 F.3d 1272, 1276 (9th Cir. 1999).  On the other hand, Title VII and the ADA are federal statutes postdating the RLA.  So finding that the federal claims constitute minor disputes is only half of the battle: Congress must also have intended for Title VII and the ADA not to supplant conflicting provisions in the RLA.  *See Brown*, 254 F.3d at 661–64; *but see Stanley*, 808 F. App'x at 352 n.1.

But it is not the Court's role to construct arguments on behalf of counsel, so the Court need not address this issue as neither party addresses it in their briefing. *See Grover v. BMW of North America, LLC*, 581 F. Supp. 3d 930, 938 n.16 (N.D. Ohio 2022); *Metz v. United Bank*, No. 05:05-cv-1510, 2008 WL 11353759, at *2 (N.D. Ohio Aug. 4, 2008).  And even if Counsel had raised this issue, they would be unlikely to succeed.  When Congress passes two statutes on the same topic, courts are not at "liberty to pick and choose among congressional enactments"; rather, they must "strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (internal quotation marks omitted) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  Thus, a party suggesting that a statute implicitly repeals an earlier enactment must overcome a "stron[g] presum[ption] that repeals by implication are disfavored and that Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute. *Id.*  Absent an explicit repeal, courts will not find an earlier statute to be repealed by a later enactment

unless Congress's intent to do so was "clear and manifest" or the two statutes are "irreconcilable." *Morton*, 417 U.S. at 550–51. Under this demanding standard, courts typically hold newer statutes to have not repealed the RLA's mandatory arbitration scheme by implication.[5]

For these reasons, I recommend that the Court enter summary judgment against the Pilot-Plaintiffs on Counts I, III, and V.

### b.    Retaliation

The Pilots' retaliation claims, on the other hand, are not minor disputes under the RLA. The ADA and Title VII both prohibit employers from retaliating against employees for enforcing their rights under the Act. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015); *Virts*, 285 F.3d at 521. Under both statutes, the employer's retaliatory conduct need not be the "sole" factor motivating the employer's adverse action. *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 & n.5 (2d Cir. 2013); *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012); *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 671 n.8 (M.D. Tenn. 2017). Retaliation must, however, be a "but-for" cause of the adverse action. *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347, 359–60

---

[5] *See, e.g.*, *Brown*, 254 F.3d at 661–64 (ADA); *Coker*, 165 F.3d at 584 (ERISA); *Crayton v. Long Island R.R.*, No. 05 CV 1721(SLT)(SMG), 2006 WL 3833114, at *4–5 (E.D.N.Y. Dec. 29, 2006) (Title VII); *Moss v. Norfolk Western Ry. Co.*, No. 02-74237, 2003 WL 21817127, at *5 (E.D. Mich. July 22, 2003) (Title VII).

(2013); *Lewis*, 681 F.3d at 671–72.  To survive summary judgment, an employee must provide either direct or indirect evidence of the employer's retaliatory conduct. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  "Direct evidence is that evidence which, if believed, requires the conclusion that" retaliation was the cause of "the employer's actions." *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).  If the employee cannot point to any direct evidence of retaliation, then he or she must use the familiar *McDonnell Douglass* framework to prove that the record contains enough circumstantial evidence for a reasonable factfinder to infer that the employer took its actions in retaliation for the employee engaging in protected conduct.  *Ford Motor Co.*, 782 F.3d at 767; *Chen*, 580 F.3d at 400.

Under the *McDonnell Douglas* framework, the employee has the initial burden to "establish a prima facie case of" retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the employee successfully puts forth a prima facie case, then the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.*  Once the employer does so, the burden shifts back to the employee to provide evidence that the employer's justification is pretextual, and that the employer's adverse employment action was actually motivated by the employee's disability.  *Id.* at 804; *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 1999)).

23

Kalitta maintains that it placed the Pilots on unpaid leave because the CBA prohibited their requested accommodations.  (ECF No. 19, PageID.266).   Thus, Kalitta explains, the Court cannot determine its motivation for placing the Pilot's on leave without first determining whether the CBA prohibits their requested accommodations.  (*Id.*)

But although the CBA is relevant to this inquiry, it cannot "conclusively resolv[e]" whether Kalitta's adverse actions were motivated by a desire to retaliate against the Pilots regardless of how it is interpreted.  *Norris*, 512 U.S. at 263, 265; *see also DeCoe*, 32 F.3d at 216.

Suppose the Court evaluated the relevant CBA provisions and concluded that, contrary to Kalitta's arguments otherwise, the CBA did not actually prohibit the Pilot's requested accommodations.  To prevail on their retaliation claim, the Pilots would need to prove "both" that Kalitta's justification was pretextual "and" that its true motivation was to retaliate.  *Hicks*, 509 U.S. at 515.   These are distinct requirements.  *Id.*  And while evidence that Kalitta's motivation is pretextual would also raise a genuine dispute as to whether Kalitta had a retaliatory motive, it would not necessarily *prove* Kalitta's retaliatory motive.  *Griffin*, 689 F.3d at 594; *see also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544–45 (6th Cir. 2008).

Here, the CBA does not conclusively resolve either requirement.  To start, the mere fact that a tribunal might disagree about what the CBA requires does not prove

24

that Kalitta's justification was pretextual.  Only Kalitta's subjective belief about

what the CBA requires—not the CBA's true, objective meaning—is relevant to

determining Kalitta's motivation.  *See Nassar*, 570 U.S. at 347, 359–60; *Lewis*, 681

F.3d at 671–72.  Kalitta could have simply disagreed about what the CBA required,

and if so, their justification would not be pretextual.  Finding that Kalitta incorrectly

read the CBA would merely be a relevant, but nondispositive, indication that they

proffered a pretextual justification.  *See Brown*, 254 F.3d at 668.  Moreover, even if

a factfinder concluded that Kalitta's justification was pretextual, that is not enough

to warrant judgment in favor of the Pilots.  *See Griffin*, 689 F.3d at 594.  Just because

Kalitta may have provided a pretextual justification, it does not necessarily follow

that their true motivation was to retaliate.  *See id.*  At most, such a finding would

create a genuine dispute as to whether Kalitta took an adverse action against the

Pilots in retaliation for their requests.  *See id.*

Now suppose, on the other hand, that the Court interpreted the relevant CBA

provisions and agreed with Kalitta that the CBA did not allow the Pilots' requested

accommodations.  For three reasons, this too would not conclusively resolve their

retaliation claims.

First, under *McDonnell Douglas*, the Pilots could still prove that Kalitta's

justification was pretextual.  Once an employer proffers a legitimate justification for

an adverse action, the employee can prove that the legitimate reason was pretextual

25

by presenting evidence that: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400; *see also Virts*, 285 F.3d at 521.   Finding that the CBA does prohibit the Pilots' requested accommodations would establish that Kalitta's justification had a basis in fact, but that finding *alone* would not conclusively resolve whether Kalitta was actually motivated by the CBA. *See Chen*, 580 F.3d at 400.   Indeed, Kalitta's written denials explain that the company based its decision on a federal executive order requiring vaccination, not its inability to accommodate the Pilots under the CBA. (ECF No. 26-5, PageID.359; ECF No. 26-6, PageID.361).   And the Pilots may still uncover evidence that Kalitta had other motivations for its adverse actions. *See Virts*, 285 F.3d at 521.   Moreover, the CBA may be insufficient to explain *all* of the retaliatory conduct the Pilots allege. *See id.*   For example, while the CBA might shed light on why Kalitta denied the Pilots' accommodations, Kalitta's inability to accommodate the Pilots does not explain why it allegedly took adverse actions beyond simply denying their accommodations, such as contesting their former employees' attempts to collect unemployment insurance.[6]   (ECF No. 1, PageID.13–15, ¶¶ 26–29; *see also* ECF Nos. 1-1 to 1-12).

---

[6] Whether such evidence exists is beside the point at this stage: the only question before the Court is whether an essential element of the Pilots' retaliation claims necessarily turns

Second, the Pilots need not produce any evidence of pretext under *McDonnell Douglas* if they can uncover direct evidence of Kalitta's retaliatory intent during discovery. *See Chen*, 580 F.3d at 400. Such evidence would create a genuine dispute of material fact notwithstanding any support Kalitta may find in the CBA for its decision. *See Brown*, 254 F.3d at 667–68 ("[A]n employer cannot ensure the preclusion of a plaintiff's claim merely by . . . arguing that the action challenged by the plaintiff is 'arguably justified' by the terms of a CBA."). Again, the CBA would merely be relevant, but nondispositive, evidence of Kalitta's motives. *Id.*

And third, even if Kalitta showed that a CBA provision preventing them from accommodating the Pilots was a "but-for" cause of their adverse actions, that too would not resolve the issue. Under both Title VII and the ADA, an employer can have multiple "but-for" causes behind a decision. *Zann Kwan*, 737 F.3d 834, 846 & n.5.[7] Put differently, an adverse action can have several motivations that are each independently sufficient to prompt the employer's decision. *Id.* Kalitta could have taken adverse actions against the Pilots because they could not be accommodated,

---

on the meaning of the CBA. *See DeCoe*, 32 F.3d at 216; *see also Emswiler*, 691 F.3d at 792.

[7] *See also Nassar*, 570 U.S. at 347, 359–60 (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, & Comment b (2010)) (holding that plaintiffs cannot prove causation in a Title VII retaliation claim where the employer's retaliatory motivation was simply a "motivating factor," that was inadequate to justify the decision on its own, but still recognizing that plaintiffs can demonstrate but-for causation in the "rare" instances where there exist "multiple, independently sufficient" motivations)

as well as in retaliation for the Pilots' accommodation requests.  These motives are not mutually exclusive.

That all serves to illustrate what the Supreme Court explained in *Norris*: "purely factual questions concerning" an "employer's motive" do not depend on the meaning of a CBA.  512 U.S. at 261 (internal quotation marks omitted).  Contracts do not dictate an individual's thoughts.  And the terms of a CBA provide limited insight, if any, as to the motivations for an employer's conduct. Regardless of how the Court interprets the CBA, the CBA alone cannot conclusively resolve whether Kalitta intentionally retaliated against the Pilots because of their request.  *See id.* at 265–66; *Brown*, 254 F.3d at 667–68.  Because Kalitta's motivation for its adverse actions does not depend on the meaning of any term in the CBA, the Pilots' retaliation claims do not constitute minor disputes and are not subject to arbitration under the RLA.

### 2.  Rule 56(d)

The Court should also deny the Pilots' motion for additional discovery under Rule 56(d).  (ECF No. 38).  Although "a party may file a motion for summary judgment at any time until [thirty] days after the close of discovery," the party opposing summary judgment "must receive a full opportunity to conduct" all necessary discovery. *Cardinal v. Metrish*, 564 F.3d 794, 797 (6th Cir. 2009).  Thus, when a "nonmovant shows" that it cannot present sufficient facts to oppose summary

28

judgment, the Court may: "(1) defer considering the motion or deny it; (2) allow time to . . . take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d)(1)–(3).  "A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact."  *FTC v. E.M.A Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (quoting *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 297 (8th Cir. 1975)).  Courts need not grant additional time to conduct discovery on facts that "would be irrelevant to the underlying issue to be decided."  *In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. & Sales Practices Litig.*, 752 F.3d 1065, 1074 (6th Cir. 2014).

All of the additional evidence sought by the Pilots is irrelevant to Kalitta's motion.  Much of their requested discovery seeks information concerning how Kalitta's CBA is applied in practice.  (*See* ECF No. 38-1).  And true enough, "the relevant terms of [a CBA] are not only those that are written down; they also include the parties' practice, usage, and custom as they carry out their agreement."  *Bhd of Locomotive Eng'rs and Trainmen v. Union Pacific Railroad Co.*, 879 F.3d 754, 758 (7th Cir. 2017).  So this discovery might help the Pilots prove whether their requested accommodations would violate the CBA.  *See id.*  But the RLA precludes their claims simply if they cannot be decided without "interpret[ing]" the CBA;

29

whether the accommodations would actually violate the CBA is irrelevant. *Emswiler*, 691 F.3d at 792–93. As explained above, the Pilot's ability to contest Kalitta's interpretation of the CBA with evidence of the parties' practice and customs only demonstrates that the Pilots' accommodation claims cannot be decided without consulting the CBA.

The rest of the Pilots' requested discovery would explore whether Kalitta could have provided alternative accommodations that would not have violated the CBA. (ECF No. 38-1). But again, this would not change the outcome here. Allowing the Pilots to fly unvaccinated would arguably violate seniority provisions contained in the CBA, and no additional requirements, such as masking or regular testing, can obviate this potential conflict. Accordingly, I recommend that the Court deny the Pilot's motion to conduct additional discovery under Rule 56(d).

### E. Conclusion

For these reasons, **I RECOMMEND** the Court **GRANT** Defendants' motion for summary judgment (ECF No. 19) **IN PART** and **DENY** Plaintiffs' motion to conduct additional discovery (ECF No. 38). Specifically, the Court should enter summary judgment against Plaintiffs Webber, Hudnutt, Tougas, Galton, and McAllister on Counts I, III, and V and deny summary judgment against Plaintiffs Webber, Hudnutt, and Tougas on Counts II and IV. Plaintiffs Galton and McAllister should be **DISMISSED** from this action.

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address

31

each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 26, 2023                      s/ Patricia T. Morris
                                         Patricia T. Morris
                                         United States Magistrate Judge